FILED

04/26/2022

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 30, 2021 Session

## EDNA GERGEL v. JAMES GERGEL

**Appeal from the Chancery Court for Anderson County**
**No. 15CH7132      M. Nichole Cantrell, Chancellor**

_____

### No. E2020-01534-COA-R3-CV

_____

In this divorce action, the husband appeals the trial court's distribution of the marital estate, denial of the husband's request for alimony *in futuro*, grant to the wife of sole decision-making authority over the parties' minor child, and grants to the wife of attorney's fees and discretionary costs. The husband, who received disability benefits for a prior mental health diagnosis, also appeals the trial court's finding that he was voluntarily unemployed and the court's denial of his motion to strike certain expert witness testimony. Having determined that an unspecified portion of the discretionary costs awarded to the wife for fees related to three expert witnesses, one vocational rehabilitation consultant and two psychiatrists, were not allowable under Tennessee Rule of Civil Procedure 54.04(2), we vacate the trial court's award of discretionary costs as to the fees for these three experts' work with the exception of $2,070.00 in demonstrably allowable fees paid to the vocational consultant. We remand for a specific determination of the fees for these three experts allowable, if any, as an award of discretionary costs to the wife under Rule 54.04(2). We also modify the trial court's award of discretionary costs to the wife for court reporter fees to reduce them slightly pursuant to Rule 54.04(2). We otherwise affirm the trial court's judgment. We deny the wife's request for an award of attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part as Modified, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Mandy M. Hancock, Knoxville, Tennessee, for the appellant, James Gergel.

Donald Capparella and Kimberly Macdonald, Nashville, Tennessee, for the appellee, Edna Gergel.

**OPINION**

**I. Factual and Procedural Background**

The plaintiff, Edna Gergel ("Wife"), and the defendant, James Gergel ("Husband"), were married in October 1997. The marriage produced one child, a daughter ("the Child"), who was thirteen years of age at the time of the divorce decree's entry. Both parties are highly educated. Wife holds a doctorate in biochemistry and molecular cell biology, and Husband holds two master's degrees, one in chemistry and one in the philosophy of biochemistry. The parties settled in Oak Ridge, Tennessee, in 2007 when both began working at the Oak Ridge National Laboratory ("ORNL"). At the time of the divorce decree's entry, Wife was employed in the Patents Department at ORNL, earning approximately $138,000.00 per year. Husband had been employed as a Senior Technical Staff Member in the Computer Science and Mathematics Division at ORNL, earning approximately $80,000.00, until 2011 when he applied for disability benefits due to mental health concerns. Husband was subsequently granted Social Security Disability benefits in April 2013 and also drew long-term disability benefits through ORNL. At the time of trial, Husband had a gross monthly income of $4,235.60, or $50,827.20 yearly. In addition, the Child received $893.00 monthly, paid to Wife, in Social Security benefits due to Husband's disability.

On April 28, 2015, Wife filed a complaint for divorce in the Anderson County Chancery Court ("trial court"), alleging as grounds irreconcilable differences or, in the alternative, inappropriate marital conduct. *See* Tenn. Code Ann. § 36-4-101(14), (11) (2021). Wife requested child support *pendente lite* and reasonable attorney's fees in the event that the parties were unable to reach an agreement. Wife vacated the marital residence, taking the Child with her, in May 2015, moving into the maternal grandmother's residence. Wife remained employed at ORNL.

Husband filed an answer and counter-complaint on June 16, 2015, requesting dismissal of Wife's complaint and a divorce on his alleged grounds of abandonment and cruel and inhuman treatment. *See* Tenn. Code Ann. § 36-4-101 (13), (11). He also alleged parental alienation and requested custody of the Child, child support, spousal support, an award of the marital residence and its contents, and attorney's fees for defending against the complaint. Wife filed an answer to the counter-complaint on July 9, 2015, denying all substantive allegations. The complaint, counter-complaint, and contemporaneous motions filed respectively by the parties indicate that each party filed a proposed parenting plan, although neither is in the appellate record as an attachment to a pleading. It is clear from the pleadings that Wife was requesting that Husband have zero days of co-parenting time due to his alleged "mental instability."

Records and expert opinions concerning Husband's mental state were at issue throughout the pendency of the divorce and at trial. In the April 2013 decision issued by the Social Security Administration, presented as an exhibit at trial in the instant action, Husband was granted disability benefits upon a finding, in part, that he had "1) [m]ajor depressive disorder, recurrent, moderate-to-severe with psychotic features, and 2) anxiety disorder." Upon a motion filed by Wife, the trial court entered an "Agreed Order for Release of Privileged Information" on August 17, 2015, directing that "[a]ll mental health and psychological [records] of [Husband] shall be made available to counsel for [Wife]." The trial court concomitantly entered an "Agreed Protective Order," directing that any records concerning the parties not be released for any use other than in the instant action.

On November 6, 2015, the trial court entered an agreed interim order, dismissing an *ex parte* order of protection that had been entered against Husband and entering instead a mutual temporary restraining order, as well as a temporary parenting plan. The temporary parenting plan granted to Husband co-parenting time on alternate Saturday and Sunday afternoons and Wednesday evenings, provided that the co-parenting occur "somewhere other than the marital home" and that the Child be fed and her homework completed before she was returned to Wife. This order was subsequently "restated" in December 2015. A mediator's report was filed on November 30, 2015, indicating that no issues were resolved.

Upon Husband's motion and in an agreed order entered on June 7, 2016, the trial court, *inter alia*, appointed attorney Kelly Wojciechowski as a guardian *ad litem* ("GAL") to represent the Child's best interest. The court subsequently entered an order setting forth the parties' agreement concerning the GAL's access to the Child, other individuals, and information she would need to represent the Child, as well as the parties' agreement that they would equally split the GAL's fees. On May 2, 2017, Husband filed a motion to expand his co-parenting time. Wife filed a response objecting to Husband's motion, alleging that Husband suffered from "severe mental illness," the symptoms of which included repeated suicidal attempts and threats; "delusional thinking, hearing voices, writing and verbalizing, including writing on the walls of the marital home such as 'chop it off'"; physical and verbal harassment of Wife; hoarding in the marital residence; "[i]nability to stay awake or to maintain a schedule"; and "[i]nability to control his impulses." Following a hearing conducted in May 2017, the trial court entered an order on August 28, 2017, denying Husband's motion for expanded co-parenting time.

In its June 2016 agreed order, the trial court had also appointed Dr. Susan Koller as Wife's "witness to conduct a forensic psychological evaluation of [Husband]." In a subsequent agreed order entered on June 19, 2017, the court released Dr. Koller and appointed Peter B. Young, Ph.D., as Wife's expert witness to conduct Husband's forensic psychological evaluation. Following submission of Dr. Young's psychological

evaluation of Husband and Dr. Young's deposition, as well as the deposition of Michael A. Fisher, M.D., who was Husband's treating psychiatrist, the trial court conducted an in-chambers status conference on May 3, 2018. The court then entered an order on May 24, 2018, establishing supervised visitation for Husband with the Child at The Assurance Group. In this order, the court also provided that Husband could continue telephone and video contact with the Child and that he could attend school and public events at which the Child was in attendance. The court specifically precluded Husband from driving with the Child in the vehicle due to concerns for the Child's safety.

On November 28, 2018, Husband filed a motion in limine requesting that Dr. Young's deposition testimony and report be excluded. Husband averred that contrary to Dr. Young's assertion during his deposition testimony, taken on December 12, 2017, that he had never had any complaints lodged against him, the Tennessee Board of Examiners in Psychology had entered a consent order on December 7, 2017, suspending Dr. Young's license, effective thirty days following entry of the order, due to two disciplinary complaints unrelated to this action. Husband attached a copy of the December 2017 consent order to his motion. Wife filed a reply, acknowledging that Dr. Young's testimony stating that he had not had disciplinary action taken against him had been "patently untrue" while arguing that Dr. Young's impaired credibility was irrelevant to his testimony and report in this case. Wife also filed a motion requesting that the court order Husband to provide various financial records and order the production of records of Husband's treatment by Shawn Foster Roach, a licensed clinical social worker ("LCSW Roach"). Wife averred that Dr. Fisher had relied upon LCSW Roach's records in treating Husband. On November 30, 2018, Wife filed a motion for sanctions, pursuant to Tennessee Rule of Civil Procedure 37, alleging that Husband had failed to provide financial and healthcare records as ordered and had dissipated marital assets.

Following a hearing, the trial court entered an order on December 17, 2018, denying Husband's motion to strike Dr. Young's report and testimony, stating that it would afford such "the weight the Court deems indicated." The court also denied a motion to continue that had been filed by Husband. The court granted Wife's motion for sanctions, reiterating a prior directive that Husband was to comply with discovery requests and "update and/or tender his financial records, and address the withdrawals from his banking accounts," as well as "sign the proposed Healthcare and Financial Records Orders" and HIPAA releases for his psychotherapy notes and healthcare records. The healthcare and financial records orders were subsequently signed by both parties' counsel and entered.

The court also directed in its December 17, 2018 order that the Child, if called to testify, would do so in chambers "with only the court reporter, counsel for the parties, the Guardian Ad Litem, and chancellor present." On March 25, 2019, Husband filed a

motion for unsupervised visitation with the Child, which Wife opposed. Following a hearing, the trial court denied Husband's motion for unsupervised visitation in an order entered on April 29, 2019, stating that the court "prefer[red] to hear psychological proof before considering changing the present schedule and/or method of co-parenting time." The court also found "no substantial harm" to the Child "resulting from maintaining the present co-parenting restrictions" until the trial scheduled for May 2019.

In the meantime, following various subsequent motions and a hearing, the trial court entered an order on March 15, 2019, pursuant to Tennessee Rule of Civil Procedure 35, delineating the procedure to be followed concerning the sharing and protection of information related to Husband's psychological evaluations. The trial court subsequently entered a series of orders setting forth the procedure for discovery related to a psychological evaluation conducted by Catherine Grello, Ph.D., who had been retained by Father as an expert witness. In April 2019, Wife filed two motions concerning Dr. Grello, first requesting that the trial court issue a protective order quashing Dr. Grello's noticed deposition and then requesting that Dr. Grello's deposition testimony be limited to her report. In support of these motions, Wife averred in part that Dr. Grello's opinions had been sent without any substantiating materials to allow complete preparation of cross-examination. Following hearings, the trial court entered an order on April 30, 2018, *inter alia*, denying Wife's motion to quash while limiting Dr. Grello's deposition testimony to the scope of the report that she had issued on April 8, 2019. The court also conducted an in camera review of Dr. Grello's communication file in relation to Husband and entered an order on May 8, 2019, *inter alia*, releasing email communications contained in the file to counsel for both parties.

The trial court conducted a hearing concerning various motions on May 13, 2019. Upon a motion filed by the Tennessee Department of Children's Services ("DCS") to quash a subpoena issued by Wife, the trial court entered an order on the day of the hearing, denying the motion as to two pages of DCS notes, taken in December 2013, that the court found should be released to the parties' counsel. The court later cited these notes in its final decree in stating that the Child had reported during a meeting with a DCS worker that she had heard Husband threaten to kill Wife.

On May 14, 2019, the trial court entered an order denying a motion filed by Wife to exclude Husband's request for alimony upon the court's finding that Husband had "made a general request for Spousal Support in paragraph six of his counter complaint sufficient as to put [Wife] on notice that alimony would be an issue in the pending lawsuit." In the same order, the court also denied a motion filed by Wife to exclude any testimony presented by Dr. Fisher regarding Husband's ability to work upon the court's finding that "Dr. Fisher's conclusions and expert opinions regarding how [Husband's] psychological state place any limitation or restrictions on his ability to work, fall within

the expert witness's area of expertise." The trial court also entered an "Amended Rule 35 Order" on April 1, 2019, appointing Phil Kronk, Ph.D., "as the Court's expert to evaluate [Husband] regarding any mental conditions he may have that regard his ability to parent and alleged inability to work." However, in a subsequent order, the trial court noted that Dr. Kronk had been unable to accept the appointment.

The trial court conducted the first three days of the bench trial on May 22 through 24, 2019, during which Wife presented her case and Husband's counsel, on the last day, conducted direct examination of Husband. Prior to trial, the court entered an order on May 14, 2019, denying motions that had been filed by Wife in which she had requested a finding that Husband had not sufficiently pled his alimony request and an order precluding testimony from Dr. Fisher concerning Husband's ability to maintain employment. We note that in his counter-complaint, Husband did not specify the amount or type of spousal support he was requesting. During his testimony at trial, Husband confirmed that he was seeking $2,200.00 in monthly alimony as ongoing support.

Upon a subsequent motion filed by Wife to strike the deposition testimony of Dr. Grello and a motion filed by Husband to quash requests for admissions promulgated by him, the trial court, following a hearing, entered orders on July 8 and 16, 2019, respectively denying Wife's motion to strike while sustaining Husband's motion to quash. Dr. Grello had testified via deposition on May 18, 2019, four days prior to the beginning of trial. Wife asserted in her motion that Dr. Grello had not confined her testimony to her report as the court had previously ordered and that she had delayed in producing multiple materials, including results of testing administered to Husband. In its July 8, 2019 order, the court determined that it would give Dr. Grello's testimony "such weight as the Court deems it entitled" despite finding that Husband had not provided Dr. Grello with all of his relevant records and had failed to inform her of a "secondary gain" issue in that he was seeking alimony. Dr. Grello did not testify at trial.

After reviewing the deposition testimonies of Dr. Fisher, Dr. Young, and Dr. Grello, the trial court conducted a hearing on July 22, 2019, in which the court expressed uncertainty concerning Husband's competency to resume trial and sought the opinions of the parties' counsel and the GAL. The court entered an order on August 20, 2019, *sua sponte* continuing the proceedings, particularly the cross-examination and any redirect examination of Husband and of a vocational rehabilitation consultant, called as a witness by Wife, A. Bently Hankins, Ph.D. The court appointed J. Sidney Alexander, M.D., as a Rule 35 mental health expert to evaluate Husband's competency to participate in the instant litigation and to determine whether Husband required a conservator or guardian *ad litem* in order to participate. Following his evaluation, Dr. Alexander subsequently submitted a report in which he found Husband competent to participate in the proceedings without the benefit of a conservator or guardian *ad litem*. In his report, Dr.

- 6 -

Alexander also concluded that although Husband had "a history of over endorsing psychiatric symptoms on psychological testing, which may be consistent with a tendency to exaggerate," "[t]here is no doubt [Husband] has a serious mental illness, Schizoaffective Disorder or Schizophrenia, which has produced a plethora of serious symptoms in him, regardless."

The trial court resumed the trial over the span of three days from November 12 through 14, 2019. On the second of these three days, Dr. Alexander testified, confirming his written report concerning Husband's competency but otherwise amending his opinion concerning Husband's mental condition. Dr. Alexander explained that he had first interviewed Husband on October 25, 2019, and administered two tests to him, the Structured Inventory of Malingering Symptomology ("SIMS") and the Central Nervous System Vital Signs test ("CNSVS"). He then submitted his written report, dated November 1, 2019. Dr. Alexander subsequently interviewed Husband a second time and administered the CNSVS again on November 11, 2019. Testifying that he had "continued to read records and ponder things," including the depositions of Dr. Young and Dr. Grello, which he had not reviewed prior to writing his report, Dr. Alexander stated that he had concluded that Husband was malingering. Dr. Alexander defined malingering as "purposely exaggerating or falsifying or feigning symptoms in order to obtain something."

Husband filed a motion to strike Dr. Alexander's and Dr. Hankins's testimonies on November 14, 2019, the last day of trial. In a ruling issued at the close of the November 14 session, the trial court denied the motion to strike. The court's ruling was memorialized in an order entered on December 6, 2019, in which the court stated in part that Husband would be "afforded an opportunity to prepare to cross examine Dr. Alexander at [Husband's] convenience by deposition, or live testimony December 6, 2019, when the Court shall recommence this litigation." The bench trial then concluded with a hearing on December 6, 2019, during which Husband's counsel stated that a court reporter was preparing a transcript of a deposition taken of Dr. Alexander by the parties' counsel on the preceding day and that the transcript would be provided to the court. During the final day of trial, the court heard Husband's rebuttal testimony and closing arguments.

The trial court entered its "Final Decree" on February 26, 2020, granting to Wife a divorce on the ground of inappropriate marital conduct upon a specific finding that Husband had been physically and verbally abusive toward Wife. The court included in its decree specific sections addressing each party's respective credibility and Husband's mental health. The court found Wife to be "generally very credible" and noted that "she had done her due diligence in carefully compiling information to give a factual basis of her testimony." However, the court found that Husband "was not credible as a witness"

and that "[h]is answers were often in direct contradiction to the proof being offered." The court specifically found that Husband's credibility had been negatively affected by his testimony that "he was in complete compliance with his medication," which the court found to be "controverted by his own treating physician"; his "repeated claims that he was the victim of physical abuse by his wife"; his asking the court for a continuance to undergo a supposedly scheduled surgery that the court later discovered was neither scheduled nor performed; and his attempts to deflect questions during cross-examination and redirect them "to what he wanted to talk about instead."

Regarding Husband's mental health, the trial court particularly credited Dr. Alexander's testimony and considered the testimony of Dr. Hankins and the records from other mental health providers, including reports and records from Dr. Grello; Dr. Hankins; Dr. Fisher; Dr. Young; and Audrea K. Merchant, M.D., Husband's current treating psychiatrist since January 2019. The court ultimately concluded as to Husband's mental health condition, particularly as it related to what the court termed Husband's "secondary gain motivation" in requesting alimony:

> This was a very in depth review of the numerous observations, attempts at diagnosis and test results of [Husband]. The court concludes from all of this that [Husband] has a secondary gain motivation for "faking bad" in this case. This court concludes that he has had a secondary gain motivation for faking bad since 2011 when he sought disability instead of returning to a normal work schedule at ORNL. This court concludes based on the numerous test results and opinions of the experts in this case that [Husband] is guilty of malingering and exaggerating his mental health systems. This was not discovered until this divorce case because none of his treating physician[s] ever sought psychological testing for [Husband]; instead they simply relied on his own self-reporting of symptoms. Now that the testing has been conducted it is clear to this court that [Husband] is malingering and exaggerating due to his secondary gain motivation. This court also concludes that [Husband] has the ability and functional capacity to return to work at his previous employment or a job of similar skill set. This court adopts the conclusion that [Husband's] not working is a matter of his own lack of motivation to do so and not a result of some psychological impairment.

In delineating what it found to be an equitable distribution of the marital estate, the trial court set forth a chart of assets and debts awarded respectively to the parties. The court found only a few items of personal property to be separate property that had been gifted to Wife. As noted by Wife on appeal, the ultimate distribution was nearly equal with 50.2% of the estate, valued at $468,300.88, awarded to Wife and 49.8%, valued at

$464,000.84, awarded to Husband. The court awarded the marital residence and associated debt to Husband. The court found that each party should retain his or her own ORNL pension account, with Wife's account valued at $1,839.89 per month assuming retirement at age sixty-five while Husband's account was valued at $1,130.62 per month assuming retirement at age sixty-five. The parties were both approximately forty-nine years of age at the time of trial. As to dissipation, the court assessed Husband with dissipation of the marital assets in the amount of $20,000.00 in funds withdrawn from a joint checking account during the pendency of the divorce and in the amount of $45,000.00 for unreasonably increasing the parties' attorney's fees.

Concerning alimony, the trial court analyzed the factors provided in Tennessee Code Annotated § 36-5-121(i) to find that Wife did not have the ability to pay alimony and that Husband had the ability to resume employment and did not require alimony. The court concluded in this regard:

> The court finds that based on the fault of the parties in this divorce case, the fact that this court has concluded that [Husband] has the ability to work and chooses not to do so, finding [him] voluntarily unemployed, as well as [Husband's] receiving some $432,511.70 in marital assets this court finds that [Husband] will not be awarded the requested alimony in this case.

The trial court incorporated a permanent parenting plan order ("PPP") into the final decree, designating Wife as the primary residential parent of the Child and awarding unsupervised visitation to Husband on every Saturday afternoon and one weekday evening each week to take place only in a public place. The court precluded overnight co-parenting time for Husband to ensure that the Child would not be exposed to what the court found to be Husband's unsafe hoarding in the marital residence. The court awarded no child support, finding that the Child's receipt of Social Security benefits through Husband was sufficient to tax Husband with no further obligation. Husband subsequently filed a motion to alter or amend the PPP, requesting, as pertinent on appeal, that the court assign joint decision-making authority over the Child to the parties. Following a hearing, the court denied Husband's motion to alter or amend the decision-making authority in an order entered on July 27, 2020. In the same order, the court denied Husband's post-judgment request for an award of attorney's fees and discretionary costs.

The trial court subsequently entered additional post-judgment orders pertinent to issues raised on appeal. Upon Wife's motion filed pursuant to Tennessee Rules of Civil Procedure 59 and 60, the court awarded her $65,000.00 in attorney's fees based on Tennessee Code Annotated § 36-5-103(c) in an order entered on August 10, 2020. In the same order, the court granted Wife's post-judgment motion for discretionary costs,

pursuant to Tennessee Rule of Civil Procedure 54.04, awarding to her $10,813.30 in court reporter fees; $44,166.85 in expert witness fees; and $656.90 in interpreter fees. In a post-judgment order addressing discretionary costs, the court initially assessed Husband with the full amount of the $20,520.00 in fees that the court found were reasonably due to the GAL. However, the court later amended this order to split the GAL's fees equally between the parties as had been originally set forth in an agreed order. On October 16, 2020, the trial court entered an order, following an online conference, finding, *inter alia*, that Wife's counsel's fees were reasonable and directing entry of the order as a final order pursuant to Tennessee Rule of Civil Procedure 54.02(1). Husband timely appealed.[1]

## II. Issues Presented

On appeal, Husband presents six issues, which we have restated and reordered slightly as follows:

1.      Whether the trial court erred in the division of the marital estate.

2.      Whether the trial court erred in appointing a certain expert and allowing certain expert testimony.

3.      Whether the trial court erred by denying Husband's request for alimony.

4.      Whether the trial court erred by granting to Wife sole decision-making authority over the Child.

5.      Whether the trial court erred by granting to Wife reasonable attorney's fees.

6.      Whether the trial court erred by granting to Wife discretionary costs.

Wife has raised four additional issues, which we have condensed and restated as follows:[2]

---

[1] In an order entered on November 2, 2020, prompted by Wife's post-judgment motion for criminal contempt, the trial court found Husband to be in criminal contempt for failing to timely make three mortgage payments on the marital residence and failing to hold Wife harmless for the mortgage debt. The court sanctioned Husband with a $150.00 fine. Husband has not raised an issue on appeal regarding this contempt finding.

[2] In her statement of the issues, Wife has included more specific statements of the underlying arguments within Husband's stated issues. We do not find these necessary to include in our "Issues Presented" section and will address Wife's waiver argument concerning Husband's purported lack of specificity in a

7.      Whether Husband has waived all of his issues on appeal by failing to state them more specifically.

8.      Whether Husband has waived his issue regarding expert witness testimony by failing to timely raise it before the trial court.

9.      Whether Husband has waived his requests for attorney's fees at trial and on appeal by failing to specify each as a separate issue in his statement of the issues.

10.     Whether Wife is entitled to attorney's fees on appeal either for defending against Husband's challenge to the trial court's permanent parenting plan order, pursuant to Tennessee Code Annotated § 36-5-103(c), or for defending against a frivolous appeal, pursuant to Tennessee Code Annotated § 27-1-122.

### III.  Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has explained the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures."  *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996).  As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary.  Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).  Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court.  *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991).  Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings.  *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct.

subsequent section of this Opinion.  Additionally, we will address waiver arguments raised by Wife concerning lack of citation to authority within our analyses of the pertinent individual issues.

App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). *See Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Regarding spousal support, our Supreme Court has "repeatedly . . . observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The High Court has further explained:

> [A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew* [*v. Burlew*], 40 S.W.3d [465,] 470 [(Tenn. 2004)]; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court,

such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Id.* at 105-06 (footnotes omitted).

As to our review of the trial court's decision concerning attorney's fees in a divorce action, this Court has stated:

Our review of an award of attorney's fees is guided by the principle that "'the allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion.'" *Mimms v. Mimms*, 234 S.W.3d 634, 641 (Tenn. Ct. App. 2007) (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005)). "Reversal of the trial court's decision [regarding] attorney fees at the trial level should occur 'only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.'" *Church v. Church*, 346 S.W.3d 474, 487 (Tenn. Ct. App. 2010).

*Hernandez v. Hernandez*, No. E2012-02056-COA-R3-CV, 2013 WL 5436752, at *8 (Tenn. Ct. App. Sept. 27, 2013).

Likewise, a trial court's decision to include or exclude an expert witness's testimony is reviewed for an abuse of discretion. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005); *Jernigan v. Paasche*, 637 S.W.3d 746, 756 (Tenn. Ct. App. 2021). Furthermore, the "weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." *Brown*, 181 S.W.3d at 275. "Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony." *Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001). "Moreover, it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 676-77 (Tenn. 1983).

Additionally, this Court reviews a trial court's determination of an appropriate parenting plan according to an abuse of discretion standard. "[C]ustody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents

are secondary." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). As this Court stated in *Gaskill*:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law.

*Id.* at 631.

## IV. Waiver and Issue Statements

As a threshold matter, we consider Wife's contention that Husband has waived all of his issues on appeal in part by failing to state them more specifically in his statement of the issues. In her responsive brief, Wife has restated Husband's issues by delineating the specific arguments made by Husband in the argument section of his principal brief. Wife then essentially posits that Husband should have crafted his issues in this detailed manner in his statement of the issues and that because he did not, the issues are waived. In his reply brief, Husband has incorporated the more detailed issues as stated by Wife while arguing that his initial issue statements were sufficiently specific so as to avoid waiver. Upon careful review, we agree with Husband on this point and determine that he has not waived the issues included in his statement of the issues by failing to state them more specifically.[3]

Tennessee Rule of Appellate Procedure 27 sets forth the content of briefs submitted on appeal. The appellant's brief is required to contain "[a] statement of the issues presented for review." Tenn. R. App. P. 27(a)(4). If the appellee "is also requesting relief from the judgment," the appellee's brief "shall contain the issues and arguments involved in [her] request for relief . . . ." Tenn. R. App. P. 27(b).

---

[3] Wife argues that Husband waived his requests for attorney's fees at trial and on appeal by failing to specify each in his statement of the issues. We determine that Husband clearly raised the issue of attorney's fees at trial in his statement of the issues. However, Husband requested attorney's fees on appeal solely in the conclusion of his brief and did not include that issue in his statement of the issues. We therefore determine Husband's requests for attorney's fees on appeal to be waived. *See, e.g.*, *Brunetz v. Brunetz*, 573 S.W.3d 173, 185-86 (Tenn. Ct. App. 2018) (concluding that both parties in a divorce action had waived their respective requests for attorney's fees on appeal by raising the issue solely in the argument sections of their briefs and not in their statements of the issues). We will address the issue of attorney's fees on appeal in more detail in a subsequent section of this Opinion.

Within the context of an application for review to our Supreme Court, our High Court has explained the importance of a statement of the issues in an appellate brief:

> Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt. Appellants and parties seeking relief under Tenn. R. App. P. 11 must include in their application for permission to appeal and in their brief a statement of the issues they desire to present to the court and an argument with respect to each of the issues presented. The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver. *Fahey v. Eldridge*, 46 S.W.3d 138, 143-44 (Tenn. 2001); *State v. Williams*, 914 S.W.2d [940,] 948 [(Tenn. Crim. App. 1995)].

*Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012).

Likewise, this Court has repeatedly held that an issue may be waived if it is not included in the statement of the issues. *See, e.g.*, *Logan v. Estate of Cannon*, 602 S.W.3d 363, 383 n.4 (Tenn. Ct. App. 2019) (determining, in a second appeal before this Court, that an issue from the first appeal for which the appellees stated they were "renew[ing] all objection" was waived because the appellees had not raised it in their statement of the issues); *In re Conservatorship of Osborn*, No. M2020-01447-COA-R3-CV, 2021 WL 5144547, at *8 (Tenn. Ct. App. Nov. 5, 2021) (determining the appellants' argument concerning personal jurisdiction to be waived because it was not included in their issue statement raising violation of due process); *Himes v. Himes*, No. M2019-01344-COA-R3-CV, 2021 WL 1546961, at *8 n.5 (Tenn. Ct. App. Apr. 20, 2021) (determining that the appellant husband had waived his request for attorney's fees on appeal when he had stated the request solely in the conclusion of his brief and did not include it in his statement of the issues). In contrast to the examples cited here, Husband has clearly stated the issues raised in his statement of the issues.

In support of her specific waiver argument concerning Husband's issue regarding the division of the marital estate, Wife relies on this Court's decision in *Irvin v. Irvin*, No. M2011-02424-COA-R3-CV, 2012 WL 5993756 (Tenn. Ct. App. Nov. 30, 2012). In the instant action, Wife asserts that because Husband did not include the two specific errors he alleges in his argument section for this issue, namely the trial court's division of the parties' respective retirement plans and the court's assessment of dissipation against Husband, his stated issue of whether the trial court erred in the equitable division of the

marital estate should be waived. In *Irvin*, the appellant husband raised the trial court's division of the marital property as an issue, detailing two purported errors in the division. *Irvin*, 2012 WL 5993756, at *13. In her statement of the issues, the appellee wife stated, "'The trial court made two errors in its division of the marital estate,'" subsequently identifying two different alleged distribution errors in the argument section of her brief. *Id.* at *24 n.20. This Court determined that the wife's statement of the issues was "inadequate because it [did] not identify the 'two errors' she [sought] to assert." *Id.* However, "based on the circumstances of [the] case," this Court "exercise[d] [its] discretion to address the issues raised by Wife in the Argument portion of her appellate brief." *Id.*

As in *Irvin*, we find that it would have been preferable if Husband in the instant action had immediately informed this Court as to "'what questions [it was] supposed to answer'" regarding the division of the marital estate by identifying the two alleged errors in his statement of the issues. *See id.* (quoting *Hodge*, 382 S.W.3d at 334). However, exercising our discretion under the circumstances of this case, we likewise determine that Husband has not waived the issue of the trial court's division of the marital estate by failing to state these specific sub-issues in his statement of the issues.

Moreover, although the strands of Husband's specific arguments are not woven into his other issue statements, the statements do accurately reflect his overarching challenge to the trial court's findings on each issue. As Husband notes in his reply brief, Wife has relied in great part on critiques of "the art of drafting issues for appeal." Having carefully reviewed each of Husband's stated issues and related arguments, we find no reason to deem any of his stated issues waived.

Wife also contends that Husband has waived his issue regarding expert witness testimony by failing to raise timely objections before the trial court and that Husband has waived his issues concerning the division of pension funds and the award to Wife of attorney's fees at trial by failing to adequately cite to authority on appeal. We will address these waiver arguments within the applicable issue sections of this Opinion. At this threshold point, we reiterate our determination that Husband has not waived any of the issues stated in his statement of the issues through the manner in which he has stated them.

## V. Equitable Distribution of Marital Estate

Husband contends that the trial court erred in its distribution of the marital estate by (1) taxing Husband with a total of $65,000.00 in dissipation of marital assets and (2) inequitably dividing the parties' respective pension accounts. Wife asserts that the trial court properly found dissipation when Husband failed to account for $20,000.00 in

withdrawals from the parties' joint account during the pendency of the divorce and when Husband caused what the court found to be a $45,000.00 increase in attorney's fees that could have been avoided if not for Husband's misconduct and delays. As to Husband's pension argument, Wife posits that Husband has waived the argument by failing to adequately cite to authority and that, in any case, the division of the pension plans was within the trial court's discretion when equitably distributing the marital estate. We do not find that Husband has waived any part of his argument concerning the distribution of the marital estate. However, upon a thorough review of the record and applicable authorities, we determine that the trial court's distribution of the marital estate was equitable.

Tennessee Code Annotated § 36-4-121(c) provides statutory factors to be considered as guidance for determining an equitable division of marital property. In its final decree, the trial court set forth specific findings of fact applicable to each statutory factor. However, the court considered the statutory factors as they were provided in the version of Tennessee Code Annotated § 36-4-121(c) (2021) in effect at the time of trial, rather than the version in effect when the instant complaint was filed and therefore governing this action. *See Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 368 (Tenn. 1998) ("Statutes are presumed to operate prospectively unless the legislature clearly indicates otherwise."). Inasmuch as the only factor added to the statute by a subsequent amendment was one the trial court found to be inapplicable to this case, the distinction is one involving the numbering of factors only and constitutes harmless error. Effective July 1, 2017, the General Assembly amended Tennessee Code Annotated § 36-4-121(c) by adding a new subdivision (10) addressing valuation of a "closely held business or similar asset" and renumbering the subsequent subdivisions. *See* 2017 Tenn. Pub. Acts, Ch. 309, § 1 (H.B. 348). The trial court's reference below to the inapplicability of factor (10) therefore refers to a factor (10) that was not in effect when the instant action was filed. *See* Tenn. Code Ann. § 36-4-121(c) (2014). Likewise, the court's reference to factor (11) concerning social security benefits refers to the factor that was codified as (10) in the version applicable to this action. *See id.*[4]

---

[4] We note that effective March 31, 2022, the General Assembly has amended Tennessee Code Annotated § 36-4-121(c) to add the following subdivision as new factor to be considered when considering the equitable distribution of marital property:

> The total amount of attorney fees and expenses paid by each party in connection with the proceedings; whether the attorney fees and expenses were paid from marital property, separate property, or funds borrowed by a party; and the reasonableness, under the factors set forth in Rule 1.5 of the Tennessee Rules of Professional Conduct, and necessity of the attorney fees and expenses paid by each party[.]

*See* 2022 Tenn. Pub. Acts, Ch. 767, § 6 (S.B. 2385).

The trial court specifically found:

Under T.C.A. § 36-4-121 this Court must make an equitable division of the parties' assets and debts without regard to fault prior to determining if any award of alimony or spousal support is warranted. There are several factors listed under T.C.A. § 36-4-121(c) that this court must consider when making an equitable distribution.

**(1)     The duration of the marriage.**
These parties were married in 1997 making this a twenty-two (22) yearlong marriage. The parties separated in 2015 and the divorce has been pending since 2015, so the parties resided together for 18 years.

**(2)     The age, physical and mental health, vocation[al] skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties.**
The parties are of similar age and vocation[al] skills. Based on the Court's previous findings regarding [Husband's] alleged mental illness, this court finds that both parties are employable and have similar earning capacity. All of the parties' financial liabilities are marital which are subject to distribution in this divorce case. The court finds that currently [Husband] is receiving $4,187.[60] dollars in long term disability and social security disability, yet has the capacity and ability to earn more should he return to work.

**(3)     The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party.**
Both of these parties have a high degree of education. Both parties were in graduate school when the parties married. There is no evidence that either party significantly contributed to the education of the other.

**(4)     The relative ability of each party for future acquisitions of capital assets and income.**
Based on the expert opinion given in this case this court concludes that both parties are highly educat[ed] and were both employed at ORNL. [Husband] is currently drawing disability; however the proof has shown that he is capable of working and capable of similar future acquisition of capital assets and income as is [Wife].

**(5)[A] The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role.**

[Wife] has been consistently employed outside the home. We are not dealing with a stay-at-home homemaker who contributed to the increased earning power of her spouse. [Husband] was employed outside the home until 2011 when he began receiving disability. The testimony clearly shows that once [Husband] no longer worked he did not take on a role as a homemaker or the primary parental responsibilities for the day to day needs of the parties' child. To the contrary, [Wife] still was the primary caregiver, often having to leave work due to the needs of the minor child because [Husband] was unwilling or unable to be responsible for such simple tasks as consistently picking the child up from school. Also, [Husband's] ho[a]rding behavior continued and increased contributing to the worsening of the condition of the marital home.

Likewise, although [Husband] has not been employed since 2011 he was not, during that time, taking care of home and child related duties such that he can be said to have contributed to his wife's increased earning power. In fact the opposite is true. During this time the husband's hoarding behavior caused the condition of the home to decrease as seen by the photos taken before or at the time of separation in exhibit 41 and the wife had to leave work because the husband would not wake up in time to pick the child up from school in the afternoon.

In addition there has been the allegation in this case that [Husband] dissipated the marital assets in the amount of $25,000.00 by making unaccounted withdrawals from the parties' join[t] account beginning in June of 2015, with a $5,000.00 withdrawal after the divorce was filed and ending with a $4,000.00 withdraw[al] on 8/28/2018 as shown in exhibit #37. [Husband] would time his large withdrawals with the deposit of his wife's payroll checks and intentionally cause the direct withdrawal for the home mortgage to be underfunded. [Husband] could not account for these funds except to say he believed he paid $5,000.00 in attorney fees to Mr. Clement [Husband's initial counsel]; he was unable to specifically account for these withdrawals. Therefore this Court finds that the husband has dissipated marital assets in the amount of $20,000.00[.]

In addition [Wife] alleges [Husband] dissipated the marital estate by his excessive spending which was a problem in their marriage. [Husband] spent marital funds to amass a book collection of approximately 14,000 books, a huge collection of Lego toys, a rock collection, other toys, comic books, art supplies. These expenditures were made over the continued protest of the wife due to the stress on their finances, and were not for the benefit of the marriage or the child. These were not toys for the parties' minor child but for [Husband]. This spending also added to the hoarding of things by [Husband] in the marital residence. This Court concludes that these expenditures were wasteful; expenditures that substantially reduced the marital assets of the parties as [Husband] was spending $5,000.00 to $6,000.00 monthly on these items.

**(6)    The value of the separate property of each party.**
The parties have no separate assets other than some small items which were gifts to the wife.

**(7)    The estate of each party at the time of the marriage.**
Neither party had an estate of any value at the time of the marriage.

**(8)    The economic circumstances of each party at the time the division of property is to become effective.**
At this time [Wife] is still gainfully employed at ORNL and is making $11,204.90 monthly.[5]   [Husband] continues to draw long term disability through his former employer in the amount of $2,449.60 and Social Security Disability in the gross amount of $1,786.00, thus bringing his current monthly income to $4,235.60 and a yearly income to $50,827.20.

**(9)    The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and reasonably foreseeable expense associated with the asset.**
In [this] case, the major asset of these parties is the marital home. Because of its current condition the[r]e are numerous foreseeable expenses associated with the asset. The home currently needs repair due to two instances of water damage to the home. The Court is currently holding two checks made payable to the [parties] from their homeowner's insurance to assist in these repairs.

---

[5] Elsewhere in the final decree, the trial court found Wife's monthly gross income to be slightly higher at $11,504.74, which was the amount indicated on Wife's April 26, 2019 pay stub presented as an exhibit at trial.

In addition, the home must be cleaned out either before a sale or before it could ever be considered safe for the minor child to return there. The hoarding has reached the level that significant expenses will be incurred in order to clean out this house.

**(10)  The parties do not have a closely held business or similar asset so the factor is not applicable in this case.**

**(11)  The amount of Social Security benefits available to each spouse.**
The husband is currently drawing Social Security Disability in the amount of $1786 per month.  In addition, the parties' minor child receives $893 from Social Security due to her father's disability.

No other information was brought before this Court concerning what other Social Security benefits are or will be available to the parties.[6]

Upon consideration of the statutory factors, the trial court set forth a chart of marital assets and debts with disposition of each.  Specifically at issue on appeal, the court taxed Husband with a total of $65,000.00 in dissipation of the marital estate and directed that each party would retain his or her own ORNL pension fund despite a disparity in the amounts to be paid upon retirement.  Dissipation was assessed against Husband in two amounts:  $20,000.00 for his withdrawals from the parties' joint checking account and $45,000.00 in attorney's fees the court found to be the result of unnecessary litigation caused by Husband's actions.  The court ultimately distributed a portion of the estate valued at $464,000.84, inclusive of the $65,000.00 in dissipation, to Husband and a portion valued at $468,300.88 to Wife, yielding a percentage ratio of 49.8 percent to Husband and 50.2 percent to Wife.  On appeal, each party has respectively submitted a table pursuant to Tennessee Court of Appeals Rule 7, "list[ing] all property and debts considered by the trial court, including:  (1) all separate property, (2) all marital property, and (3) all separate and marital debts."  *See* Tenn. Ct. App. R. 7(a).  Neither party has disputed any specific valuation found by the trial court.

## A.  Dissipation

Husband contends that the trial court erred in assessing him with $20,000.00 in dissipation based on his withdrawals of funds from a joint checking account during the

---

[6] The applicable version of Tennessee Code Annotated § 36-4-121(c) (2014) additionally provided as factor (11):  "Such other factors as are now necessary to consider the equities between the parties."  This final factor was codified as factor (12) in the 2021 version of the statute.  Tenn. Code Ann. § 36-4-121(c) (2021).

pendency of the divorce and $45,000.00 in dissipation based on the court's finding that Husband's actions caused the parties' attorney's fees to be greater by that amount. "Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down." *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005). As this Court has explained:

> [T]he allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case. The factors that courts most frequently consider when determining whether a particular expenditure or transaction amounts to dissipation include: (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Id.* at 682 (internal citations and footnote omitted). Once a pattern of spending has been established as typical during the marriage, a trial court is not to consider it as dissipation. *See Altman*, 181 S.W.3d at 682 n.5 ("It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them.").

Particularly concerning the $20,000.00 in withdrawals, Husband argues that the trial court improperly required him to carry the burden of proving that he had not dissipated the funds rather than requiring Wife to prove that he had. We disagree. Husband is correct that "[t]he burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation, and that party retains throughout the burden of persuading the court that funds have been dissipated." *See Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007) (quoting *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *4 (Tenn. Ct. App. Aug. 24, 2004)) (internal citations omitted in *Burden*). However, "[o]nce the party alleging dissipation has established a prima facie case of dissipation, the burden shifts to the other spouse to show the court that the expenditures were not dissipation." *Trezevant v. Trezevant*, 568 S.W.3d 595, 618 (Tenn. Ct. App. 2018).

On appeal, Husband asserts that Wife presented "no documentation" of his $20,000.00 in unexplained withdrawals from the parties' joint bank account because the trial court's reference in its final decree to the proof of these withdrawals is to an exhibit

consisting of September 2018 email correspondence between the parties' counsel. As Wife points out, this email correspondence included a message from Wife's initial counsel to Husband's former counsel with a table itemizing each unexplained withdrawal and requesting information concerning the funds withdrawn.[7] The table included withdrawals made on dates spanning June 1, 2015, through September 14, 2017, and totaling $21,100.00. In the body of the email authored by Wife's initial counsel, she included a $4,000.00 withdrawal purportedly made by Husband on August 28, 2018, bringing the total of the allegedly unexplained withdrawals to $25,100.00.

Wife avers on appeal that the summary of withdrawals from the email correspondence was presented as a stipulated exhibit during the first portion of the trial in May 2019. The transcript of that proceeding sets forth the following exchange during Wife's testimony under direct examination by her trial counsel:

| Trial Court: | Is there documentation that shows the $25,000 withdraw, or is it already part of one of the exhibits already made part of the record? |
|---|---|
| Wife's Counsel: | Here it is. |
| Trial Court: | Do we have a transaction date? |
| Husband's Counsel: | We have a summary that was created by [Wife's initial counsel], Your Honor, and I think it's from the joint account, so I think there would have to be some testimony about that. |
| Wife's Counsel: | That's fine. |
| Trial Court: | That will be fine. I think we have all the exhibits in at this time regarding the Master Asset and Debt List. So we can continue on with [Wife's] testimony. |

---

[7] Wife's counsel was initially attorney Margaret B. Held. Throughout the trial, Wife was represented by attorney William C. Cremins. Wife's appellate counsel was substituted with the commencement of this appeal. Husband's counsel was initially attorney J. Michael Clement. Although Husband was subsequently represented by attorney Benjamin T. Barnett and then attorney Martin W. Cash, Jr., Husband's current counsel was substituted to represent him six months prior to the commencement of trial.

Wife's Counsel:     Let's talk about the missing 25,000.    From which account is it missing?

Wife:               It's missing from the joint account.

Wife's Counsel:     Did you create with [Wife's initial counsel] a summary of voluminous documents that would indicate the dates and the sums that were taken out of the joint account?

Wife:               Correct.

Wife's Counsel:     Is this a fair and adequate representation of that summary of voluminous documents?

Wife:               I believe so.

Wife's Counsel:     Would you take a look at it, please?

Wife:               (Witness complies.)

Wife's Counsel:     Now, recall for the court the date and the times sums were missing and unexplained.

Wife:               June lst, 2015, $5,000; September 21st, 2015, a thousand; November 10th, 2015, a thousand; November 23, 2015, a thousand; November 25, 2015, 600; November 28, 2015, 500; December 5th, 2015, 600; December 12, 2015, a hundred; December 12, 2015, 900; December 19, 2016, 2,000; January 15, 2016, 600; January 21, 2016, a thousand; February 10, 2016, a thousand; February 12, 2016, 2000; March 19, 2016, 500; April 3rd, 2016, 500; April 13, 2016, 600; May lst, 2016, 600; May 11, 2016, 600; April 14, 2017, a thousand, and there's one that wasn't on the list, but it's in the letter.  It's August 28, 2018, 4,000.

| | |
|---|---|
| Wife's Counsel: | Your Honor, please, by agreement of counsel, this compilation of voluminous documents will be the next exhibit. |

The trial court accepted the compilation as exhibit number 37 ("Exhibit 37") with no objection from Husband's counsel.

Husband subsequently testified as follows regarding the withdrawals listed in Exhibit 37:

| | |
|---|---|
| Husband's Counsel: | I'm handing you this list, [Husband], and I know you've seen this before. Is that correct? |
| Husband: | Yes. |
| Husband's Counsel: | Okay. Where it says June 1st, 2015, $5,000, do you know what that was for? |
| Husband: | That was the payment to [Husband's initial counsel]. |
| Husband's Counsel: | And then it also says on here there was a $4,000 withdrawal on August 28, 2018. Do you recall withdrawing $4,000 on August 28, 2018? |
| Husband: | That may have been moved to one of my other accounts. I'd have to check. I don't remember offhand what that withdrawal was. |
| Husband's Counsel: | Some of these other withdrawals when we start – like September 2015, November, there's like $1,000, $1,000. Do you recall withdrawing these amounts? |
| Husband: | I don't recall withdrawing any of them specifically, but some of them were – I went through a phase of paying for pretty much everything in cash, so that's what some of them are. |
| Husband's Counsel: | Okay. |

| | |
|---|---|
| Husband: | The rounder figures of a thousand and so forth, I'm thinking are probably more payments to lawyers, but I'm not sure. |
| Husband's Counsel: | Okay. At this time were you – I know this is around the time of the separation, and I think you said you had opened up the Amazon credit card, but do you recall when you opened up the Amazon credit card? |
| Husband: | Probably June 2015. |
| Husband's Counsel: | Did you ever make any withdrawals of cash to pay for just everyday expenses? |
| Husband: | Like I said, I paid for everything in cash at a certain point, and that was probably starting in September 2015. |
| Husband's Counsel: | When you all first separated – and let me make it clear. This is from the joint account; is that correct? |
| Husband: | Yes. |
| Husband's Counsel: | When you all first separated, did you have a separate bank account? |
| Husband: | No. |
| Husband's Counsel: | Did you eventually open up the two accounts that we have already marked as exhibits? |
| Husband: | One quickly, as a placeholder, and it sat there for a long time. And then one more recently, and I'm not exactly sure when that one was opened. |

In the email correspondence within Exhibit 37, Wife's former counsel stated that Wife "puts money into the [joint] account to cover her proportional share of the parties'

mortgage on the [marital residence], but otherwise does not use the account." During trial, Wife testified that per an agreement the parties had made shortly after the separation, she deposited three-quarters of the funds needed to cover the mortgage payment into the joint account each month with the expectation that Husband would cover the remaining quarter of the payment through his disability income. Although Husband testified that he knew of no such agreement, Wife acknowledged that Husband had paid one-quarter of the mortgage payment until he stopped depositing funds to cover his portion in January 2019. The court noted in its final decree that the mortgage payment was paid through an automatic withdrawal from the joint checking account. Wife also acknowledged that she had withdrawn $10,000.00 from the joint checking account at one point to pay a balance owed to Mattel Toy Company. Wife stated that she had "a cancelled check to prove it, too."[8] Husband at no time disputed that he had been the party who made the withdrawals listed in Exhibit 37.

In support of his argument, Husband relies on *Burden*, 250 S.W.3d at 920, in which this Court affirmed the trial court's finding that the wife had failed to carry her burden of proving a *prima facie* case of dissipation. We find *Burden* to be highly factually distinguishable from the instant action. In *Burden*, the wife alleged that the husband had dissipated a marital asset by decreasing funds in his individual bank account, which the parties agreed was marital property, from approximately $46,000.00 when he retained his divorce attorney to approximately $7,000.00 at the time of trial. *Id.* The *Burden* trial court found that although the husband had spent $25,000.00 of these funds on attorney's fees, any accounting for the remainder of the funds would be speculative primarily because of the manner in which the husband had managed the account for several years prior to the divorce, often withdrawing funds to pay expenses for his "'moonlighting' job repairing and reselling used cars" while not depositing the cash profits from his moonlighting job into the account. *Id.* The husband testified that he spent the cash profits "'here, there and yonder' on food, clothes and other expenses." *Id.*

The *Burden* trial court found that the husband's manner of managing the profits from his moonlighting job had been in place for several years prior to the divorce and that "in light of Husband's contrary testimony," it could not reach the conclusion that the funds were dissipated "by 'surmise' or 'guess.'" *Id.* Importantly, this Court in affirming the trial court's determination in this regard deferred to the trial court's credibility findings. *Id.* We note also that the *Burden* trial court taxed the husband in its equitable

---

[8] It is undisputed that at the time of the parties' separation, Wife withdrew $24,000.00 from the parties' joint account to deposit the funds in a "TNStars" college savings account for the Child. According to a log kept by Wife and presented as an exhibit at trial, this $24,000.00 consisted of funds that had been given as gifts to the Child but deposited into the joint account. Husband has not raised an issue on appeal regarding the $24,000.00 in the TNStars account.

distribution of the marital estate with the $25,000.00 he had spent in attorney's fees from the bank account in question. *Id.*

In contrast, we determine in this case that the evidence does not preponderate against the trial court's finding that Wife carried her burden of proving that the $20,000.00 in withdrawals from the joint checking account during the pendency of the divorce constituted dissipation of marital assets by Husband. By agreement of the parties, Exhibit 37 was presented as a compilation of "voluminous documents," in other words, joint bank account statements, indicating $25,100.00 in withdrawals over several months' time following the parties' separation. Husband was able to specifically account solely for the $5,000.00 he had paid as a retainer to his initial counsel. As to the first three *Altman* factors concerning dissipation of the remaining $20,000.00, (1) Husband was unable to offer any explanation indicating that the funds were spent on matters related to the marriage; (2) the funds were undisputedly withdrawn during a time when the marriage had disintegrated; and (3) the entire sum was large enough to be reasonably considered excessive. *See Altman*, 181 S.W.3d at 681-82.

Concerning the fourth factor of intent "to hide, deplete, or divert a marital asset," *see id.*, the trial court found that Husband had "time[d] his large withdrawals with the deposit of his wife's payroll checks," "intentionally caus[ing] the direct withdrawal for the home mortgage to be underfunded." Husband has not questioned this factual finding on appeal. We note that according to Wife's testimony, Husband's actions of withdrawing funds from the joint checking account contemporaneously with her deposit of funds into the account, such that the direct payment to the mortgage company would be underfunded, began to occur in January 2019, a later date than the dates of the account withdrawals in question. However, considering that the joint account was in a depleted state by January 2019 because of Husband's earlier withdrawals, his actions in 2019 of withdrawing the funds for his personal use that Wife had deposited to cover upcoming mortgage payments does exhibit an intent to hide, deplete, or divert a marital asset.

We determine that Wife established a *prima facie* case of dissipation as to the $20,000.00 in Husband's withdrawals from the parties' joint checking account, effectively shifting the burden of proof to Husband to show that he did not dissipate those funds. *See Trezevant*, 568 S.W.3d at 618. Husband in turn failed entirely to carry his burden to show that the $20,000.00 in withdrawals did not constitute dissipation of marital assets. The evidence does not preponderate against the trial court's finding of dissipation as to the $20,000.00 in bank withdrawals.

The trial court's finding that Husband dissipated $45,000.00 in marital funds by causing unnecessary expenditures of attorney's fees poses the unique but not unprecedented issue of whether conduct causing excessive attorney's fees may constitute

dissipation in a divorce case. In *Beyer v. Beyer*, 428 S.W.3d 59 (Tenn. Ct. App. 2013), this Court affirmed the trial court's finding of dissipation when the husband was found to have paid $81,000.00 to his former attorney from marital funds in an attempt to develop a civil suit against the wife for parental alienation. As this Court recently noted in *Davis v. Davis*, No. W2019-02245-COA-R3-CV, 2021 WL 4775719, at *7 (Tenn. Ct. App. Oct. 13, 2021), the husband's attempt in *Beyer* to develop a cause of action distinct from the divorce was "a different situation from paying a divorce attorney for doing legal work on the actual divorce case." In *Davis*, this Court, finding *Beyer* distinguishable, affirmed the trial court's denial of the husband's request that the wife be assessed with dissipation for what the husband characterized as "unjustified" and "extreme" "litigation tactics." *Id.*

However, in another issue involving dissipation in *Beyer*, this Court affirmed the trial court's finding that the husband's "actions caused him to incur an unnecessary and excessive amount of attorney's fees that he paid with marital funds." *Beyer*, 428 S.W.3d at 83. The *Beyer* trial court had assessed the husband with $100,000.00 in dissipation for an "'[u]nreasonable amount of attorney's fees paid by [the husband] for unsubstantiated positions and changes of counsel,'" as well as "untruthful statements under oath" prolonging the litigation. *Id.* This Court agreed with the trial court that the husband's actions in this regard constituted dissipation. *Id.* Nonetheless, because the *Beyer* trial court had failed to indicate in its order how it arrived at the amount of $100,000.00, this Court vacated the trial court's "conclusion that [the husband] dissipated the marital estate by spending $100,000 on unreasonable attorney's fees" and remanded the issue for the trial court "to further evaluate [the husband's] expenditure of attorney's fees to determine the <u>appropriate amount of dissipation</u>." *Id.* at *85 (emphasis added).

Although he does not invoke *Beyer*, Husband in this action does argue that the trial court erred in assessing $45,000.00 against him in attorney's fees as dissipation because, he asserts, the trial court made "no findings" as to these fees. Upon careful review of the trial court's order, we disagree with Husband on this point. Although the court in its final decree did not address this specific dissipation determination within its explanation of the statutory factors, it did make the following findings regarding dissipation through attorney's fees at the conclusion of its rationale for the distribution of the marital estate:

> The attorney's fees in this case were very high for both parties. The court finds that many of the charged fees resulted from [Husband's] non-compliance with previous court orders, failure to complete discovery, failure to turn over medical records, failure to disclose medical providers, and unreasonably delaying the proceedings in this matter by repeatedly seeking continuances of the trial in this matter.

- 29 -

The court finds that [Husband] had threatened to bankrupt his wife due to this divorce and in fact did cause the attorney fees in this matter [to] be excessively high, to such an extent that they rise to the level of dissipation of marital assets pursuant to T.C.A. § 36-4-121(c)(5).

The court finds that by [Husband's] own actions, and his failure to comply with discovery requests and court orders compelling discovery, [Wife] had to file and argue five Motions to Compel or Motions for Sanctions. In addition, [Husband's] failure to comply with these court orders regarding discovery and his failure to release medical records to Rule 35 evaluating experts caused this trial to be delayed six times resulting in additional expenses spent on trial preparation in addition to other additional attorney's fee[s]. One of these requested continuances was due to [Husband's] lying to this court regarding a scheduled surgery which has been discussed earlier in this order. [Husband's] failure to provide medical records and failure to abide by the court's order regarding Dr. Ko[l]ler as the Rule 35 evaluating physician caused Dr. Ko[l]ler to refuse the court's appointment necessitating the appointment of a successor Rule 35 evaluator, Dr. Peter Young. The delay is this cause of action was [exacerbated] by the continued turn over in [Husband's] legal counsel.

The court also finds as previously discussed that even after being ordered to do so, [Husband] continued to withhold his full medical history from the numerous experts in this cause of action. As the court has previously noted neither Dr. Ko[l]ler, Dr. Peter Young, Dr. Grello, nor Dr. Alexander was ever provided a full and complete set of medical records by [Husband]. [Husband] by and through his own actions waited long enough before disclosing that he had been seen and tested by Dr. Smith that her records were destroyed in the interim.[9]

[Husband's] malingering, exaggerating and lying regarding his mental issues caused additional cost and time of this court appointing Dr. Alexander to evaluate him regarding his competency to continue with the divorce trial.

---

[9] In her June 2019 motion to strike Dr. Grello's testimony, Wife averred that Husband had failed in discovery to reveal the identity of Kathryn R. Smith, Ph.D., a psychiatrist who had administered testing to Husband in November 2007 and treated him in December 2007 and January 2008. According to Wife's motion, Husband's counsel had revealed Dr. Smith's name during a telephonic motion hearing in 2018. In answer to a discovery request, Dr. Smith submitted an affidavit, filed with the trial court in April 2019, attaching calendar pages noting Husband's appointments with her while explaining that any other record of her treatment of Husband had been destroyed given the time period that had elapsed since treatment.

In addition, there arose the necessity to file motions and have hearing[s] regarding [Husband's] expert, Dr. Grello, refusing to turn over all of her file regarding [Husband] and the testing that she administered on [Husband].

All of these actions increased the costs and attorney fees of both parties. Yet because the court holds [Husband] responsible for his actions in not complying with the orders of this court, and the court finds that [Husband's] intentional acts unreasonably increased the attorney fee burden on [Wife] which resulted in a dissipation of marital assets under T.C.A. § 36-4-121(c)(5).

The court has done a th[o]rough line item review of the attorney's fees charged by counsel, both current and past and has calculated the amounts directly attributable to one of the numerous actions detailed above. The court hereby finds that [Husband] caused a dissipation in marital assets by his intentional action or through his own action by failing to abide by court orders, discovery requests, and failing to provide full and complete medical records in the amount of $45,000.00 which were paid out of marital assets. This dissipation of marital assets is reflected in the above chart of distribution of marital assets.

Contrary to Husband's assertion, we conclude that the trial court made detailed findings regarding the manner in which Husband's actions unnecessarily increased attorney's fees paid out of marital assets. Noting the trial court's determination that Husband was not a credible witness and its finding that Wife was credible in stating that Husband had threatened to bankrupt her through the divorce, we emphasize that the trial court's credibility determinations are afforded great weight on appeal. *See Keyt*, 244 S.W.3d at 327.[10] Moreover, the record supports the trial court's findings concerning repeated delays in the proceedings caused by Husband's failure to promptly comply with discovery orders and to cooperate in providing medical records. We respect and credit the trial court's statement in its final order that in setting the amount of dissipation through attorney's fees at $45,000.00, the court conducted a thorough line-by-line review of the attorneys' invoices to "calculate[] the amounts directly attributable" to Husband's actions unnecessarily extending the litigation. These detailed invoices are in the record, and the amount attributed by the trial court to dissipation is a mere fraction of the attorney's fees incurred in this matter.

---

[10] In response to a question regarding what Husband said when she told him that she wanted a divorce, Wife testified: "He told me that he would contest me having custody of [the Child] even if it would bankrupt us."

Husband asserts that "the record is filled with filings by the Wife that made this case very contested causing Husband to incur substantial attorney fees." However, Husband fails to address the trial court's finding that many of Wife's filings, including her multiple motions seeking Husband's compliance with discovery requests and orders, were necessitated by Husband's failure to comply with those requests and orders. In support of his argument that Wife was responsible for much of the extended litigation in this action, Husband asserts that the testimony of Dr. Young, Wife's initial expert, "caused this case to amplify" and "cast great doubt on the safety" of the Child in Husband's care. In its June 2016 agreed order, the trial court initially appointed Dr. Koller as Wife's expert witness to conduct Husband's forensic psychological evaluation. Approximately one year later, the court entered an agreed order releasing Dr. Koller and appointing Dr. Young. In its final decree, the court specifically found that Husband's "failure to provide medical records and failure to abide by the court's order regarding Dr. Ko[l]ler as the Rule 35 evaluating physician caused Dr. Ko[l]ler to refuse the court's appointment necessitating the appointment of a successor Rule 35 evaluator, Dr. Peter Young."

It is undisputed that Dr. Young, under oath during his December 2017 deposition, responded untruthfully when asked if he had ever incurred disciplinary complaints, failing to acknowledge that his license had been suspended a few days before the deposition due to two disciplinary complaints unrelated to this action. Upon Husband's motion to exclude Dr. Young's report and testimony and Wife's reply objecting to the exclusion, the trial court found that Dr. Young had "perjured himself" with his response regarding disciplinary complaints. However, the court denied Husband's motion to exclude, stating in its December 17, 2018 order that it would afford Dr. Young's testimony and report "the weight the Court deems indicated." In emphasizing Dr. Young's failure to testify truthfully as to the disciplinary complaints, Husband implies that Dr. Young's concern regarding the safety of the Child in Husband's care was overblown and was somehow responsible for much of the extensive litigation.

We find Husband's allegation in this regard to be irrelevant to the trial court's finding of dissipation through increased attorney's fees, and the additional matters addressed in the trial court's December 17, 2018 order provide an illustrative example of why. In addition to addressing the question of Dr. Young's testimony and report, the trial court in this order also, *inter alia*, denied a motion to continue proffered by Husband upon noting multiple previous continuances and the court's prior advice to Husband "to retain counsel *post haste*" when his former counsel had withdrawn a few months before. Also entertaining a motion for sanctions filed by Wife, the trial court ordered Husband to "update and/or tender his financial records, and address the withdrawals from his banking accounts"; sign proposed healthcare and financial records release orders; and within ten

days of the order's entry, "update his discovery answers, and produce records of all of his accounts as requested via interrogatories, and/or requests for production of documents." Finally, the court stated in the December 2017 order:

> The Court has previously Ordered [Husband's] financial and healthcare records be produced to counsel for [Wife], yet compliance has yet to occur, necessitating this motion hearing. Court costs and counsel fees incident to compelling financial records and healthcare records compliance shall be, and are, awarded [Wife] incident to efforts to obtain these records[.]

As the trial court delineated, this is one example of many in the record in which Husband's failure to comply or delay in complying with discovery requests and orders extended the litigation. The trial court also found that Husband's credibility in requesting multiple continuances was impugned when he ultimately acknowledged during the second portion of the trial that he had previously requested a continuance "for a surgery that was never actually scheduled or performed."

Furthermore, within the specific circumstances of this case, we determine that the trial court's finding regarding dissipation through unnecessarily incurred attorney's fees satisfies the *Altman* dissipation factors. The trial court clearly identified the $45,000.00 in fees as excessive, and given the nature of the fees, they were incurred during the breakdown of the parties' marriage and were not in service of the marriage. *See Altman*, 181 S.W.3d at 681-82. Additionally, the trial court specifically credited Wife's statement that Husband had expressed his intent to bankrupt her through the divorce, satisfying the fourth factor of intent to deplete a marital asset. *See id.* Moreover, in contrast to the trial court in *Beyer*, *see* 428 S.W.3d at 83, the trial court here delineated Husband's actions that the court found caused unnecessary attorney's fees and conducted a line-item review of the fees charged to arrive at the amount assessed.

Finally, in regard to dissipation, within its analysis of factor five, *see* Tenn. Code Ann. § 36-4-121(c)(5), the trial court found that Husband had been responsible for $5,000.00 to $6,000.00 in monthly expenditures during the marriage that were "wasteful" and were "made over the continued protest" of Wife. These expenditures included Husband's collections of books, "Lego toys, a rock collection, other toys, comic books, art supplies." Husband has not raised an issue regarding the trial court's finding of wasteful expenditures. Wife has mentioned the finding in a footnote of her brief, asserting that these expenditures also constituted dissipation. We note that the trial court did not assess Husband with dissipation related to these expenditures in the division of marital property. Although Wife testified that she objected to Husband's spending during

the marriage, the parties' respective testimonies also indicated that Wife tolerated it for some time.

Inasmuch as spending that was typical during the marriage does not constitute dissipation, we agree with the trial court's decision not to include what it found to be Husband's "wasteful" expenditures as dissipation. *See Altman*, 181 S.W.3d at 682 n.5 ("It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them."). However, we also determine the trial court's consideration of Husband's excessive spending during the marriage within its analysis of statutory factors to be appropriate because such spending did constitute a failure to preserve marital assets that may be considered as a factor "necessary to consider the equities between the parties." *See* Tenn. Code Ann. § 36-4-121(c)(11) (2014); *Pack v. Pack*, No. M2018-00491-COA-R3-CV, 2019 WL 1934818, at *9 (Tenn. Ct. App. Apr. 30, 2019) ("While the 17 years of wasteful expenditures would not constitute 'dissipation of marital assets,' as that term is defined in the statute, it can be considered as a failure to preserve marital assets[.]" (citing *Flannary v. Flannary*, 121 S.W.3d 647, 651 (Tenn. 2003)).

We conclude that the evidence does not preponderate against the trial court's determinations that the $20,000.00 in funds withdrawn by Husband from the parties' joint account and the $45,000.00 in attorney's fees the court found to be caused by Husband's misconduct and delays constituted marital assets dissipated by Husband to be considered in the equitable distribution of the marital estate. The trial court did not abuse its discretion in assessing Husband with $65,000.00 total in dissipation.

### B. Pension Accounts

In its distribution of the marital estate, the trial court directed that each party would retain his or her individual ORNL pension plan. During trial, Wife presented, by agreement of the parties, May 2019 letters from a representative of Pension Operations at ORNL, stating that Wife and Husband were each "vested in the Pension Plan for Employees at ORNL," with an "estimated monthly defined benefit accrued as of 5/22/2019 and payable at age 65 as a Single Life Annuity." Wife's monthly benefit at age sixty-five was estimated at $1,839.89, while Husband's monthly benefit at age sixty-five, provided that he continue "to meet the requirements under the LTD [long-term disability] plan," was estimated at $1,130.62. At the time of trial, both parties were forty-nine years of age. In each letter, the ORNL representative stated: "We do not calculate the present value of the vested benefit because the only benefit option provided by the current plan is a monthly payment."

Husband contends that the trial court erred "by not making an equitable division of the parties' pension accounts," asserting that the court should have granted $354.61 per month of Wife's pension account, approximately half of the difference between the two monthly benefits, to Husband to render an equitable division. Wife contends that Husband has waived this argument because he did not cite to any authority specifically in support of his proposition that the pension accounts should be equally divided in order for the distribution of the marital estate to be equitable. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) ("The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue."). Noting that Husband has cited generally in his argument section to principles of equitable distribution and exercising our discretion, we do not find Husband's argument to be waived. However, we agree with Wife that Husband has failed to cite any authority supporting his contention that the pensions accounts must be divided equally, and we know of none so long as the overall distribution of the marital estate is determined to be equitable. Given the nearly equal distribution of marital property in the trial court's final order, we discern no abuse of discretion in the court's decision to have each party retain his or her own ORNL pension account.

## C. Equitable Distribution

As recognized above, "[t]his Court gives great weight to the decisions of the trial court in dividing marital assets and 'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *See Keyt*, 244 S.W.3d at 327 (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). This Court has also previously elucidated:

> The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts must accord great weight to a trial court's division of marital property. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property. Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable.

*Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007) (internal citations omitted); *see also Payne v. Payne*, No. E2006-02467-COA-R3-CV, 2007 WL 2668588 at *4 (Tenn. Ct. App. Sep. 12, 2007) ("The division of the estate is not rendered inequitable simply because it is not mathematically equal, or because each party did not receive a share of every item of marital property." (quoting *Morton v. Morton*, 182 S.W.3d 821, 833-34 (Tenn. Ct. App. 2005)) (other internal citations omitted).

In the case at bar, although the trial court's distribution of marital property is not exactly mathematically equal with 50.2% of the estate, valued at $468,300.88, awarded to Wife and 49.8%, valued at $464,000.84, awarded to Husband, we determine that the court's distribution is equitable based on consideration of the statutory factors. As Husband notes, a portion of the property granted to Husband included the trial court's finding of $65,000.00 in marital assets he had dissipated, meaning that without these dissipated funds assessed to Husband, his share of the remaining estate would be $399,000.84, or 46% as opposed to Wife's 54%. Wife argues that even without the dissipated funds assessed to Husband's total, the distribution would still be equitable and should not be "tweak[ed]" by this Court. *See Owens*, 241 S.W.3d at 490 ("[I]t is not our role to tweak the manner in which a trial court has divided the marital property."); *see also Telfer v. Telfer*, 558 S.W.3d 643, 657 (Tenn. Ct. App. 2018) ("We are very much disinclined to tinker with a lower court's decisions regarding the division of a marital estate."). We agree, and moreover, having affirmed the trial court's findings of dissipation, discern no reason to disturb the trial court's distribution of the marital estate.

The trial court's factual findings were supported by a preponderance of the evidence, and the manner in which the trial court weighed the factors contained in Tennessee Code Annotated § 36-4-121(c) was consistent with logic and reason. The result to these parties was equitable. As such, we conclude that the trial court's distribution of marital property did not lack proper evidentiary support and did not result in an "'error of law or misapplication of statutory requirements and procedures.'" *See Keyt*, 244 S.W.3d at 327 (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). We therefore affirm the trial court's equitable distribution of marital property.

## VI. Dr. Alexander's Expert Witness Testimony

In his statement of issues, Husband raises the question of "[w]hether the trial court erred in appointing and/or allowing certain expert testimony." In the argument section of his brief supporting this issue, Husband clarifies that the expert witness testimony at issue is that provided by Dr. Alexander. Husband contends that the trial court erred by "appointing an expert mid-trial to determine if Husband was competent to testify and then allowing that expert to become Wife's expert and opine on issues beyond Husband's

competency to testify." Wife contends that Husband waived this issue by failing to properly preserve it before the trial court. As a threshold matter, we determine that Husband waived a portion of the issue in that he did not object to the initial appointment of Dr. Alexander when the trial court *sua sponte* continued the trial in order to appoint an expert to complete a psychological evaluation of Husband. However, we further determine that Husband timely raised an issue concerning the scope of Dr. Alexander's testimony and that he has properly preserved that portion of his issue on appeal.

In its August 20, 2019 order, the trial court, upon its own motion and following a hearing, appointed Dr. Alexander pursuant to Tennessee Rule of Civil Procedure 35.01, which provides:

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Regarding expert witness testimony in general, Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Specifically concerning the appointment of expert witnesses in bench trials, Tennessee Rule of Evidence 706 sets forth the following guidance:[11]

> **(a)** **Appointment -** . . . . As to bench-tried issues, the court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed and may request the parties to submit nominations. The court ordinarily should appoint expert witnesses agreed upon by the parties, but in appropriate cases, for reasons stated on the record, the court may

---

[11] In contrast, Tennessee Rule of Evidence 706(a) prohibits a trial court from "appoint[ing] expert witnesses of its own selection on issues to be tried by a jury except as provided otherwise by law."

appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness's duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness's findings, the witness's deposition may be taken by any party, and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

**(b)    Compensation -** Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow. The compensation thus fixed is payable from funds which may be provided by law in criminal cases and civil actions and condemnation proceedings. In other civil actions and proceedings the compensation shall be paid by the parties in such proportion and at such time as the court directs and thereafter charged in like manner as other costs.

\* \* \*

**(d)    Parties' Experts of Own Selection -** Nothing in this rule limits the parties in calling expert witnesses of their own selection.

In its August 2019 order, the trial court described the circumstances leading to Dr. Alexander's appointment as follows:

This cause came on to be heard July 22, 2019, for the fourth day of the trial of this action which was to resume with cross-examination of [Husband] during the trial of this matter that commenced May 22, 2019. After having reviewed Psychiatrist Fisher's deposition testimony, Dr. Young's deposition, and Dr. Grello's deposition, during the weekend before the commencement of that cross-examination, the Court expressed uncertainty about [Husband's] competency. The Court sought the opinions of the parties' counsel and the *guardian ad litem* about continuing the trial.

[Wife] opposed the continuance, preferring to obtain closure and avoid additional expenses. The *guardian ad litem* and [Husband] deferred to the Court's desire to continue the case, to obtain an expert opinion as to [Husband's] competency to participate in this litigation or malingering.

Noting that the previously appointed Rule 35 expert, Dr. Kronk, had "retire[d] from forensic work" and was not available, the court appointed Dr. Alexander "to interview, test, evaluate, report, and opine, and to otherwise take such steps as believed indicated to evaluate [Husband's] competence to participate in this litigation with or without a *guardian ad litem* or conservator."

In his motion to strike Dr. Alexander's testimony, Husband averred that the August 2019 appointment order was "drafted by [Wife's] counsel [and] was entered over the objection and proposed order of [Husband's] counsel." However, the record contains no contemporaneous filing submitted by Husband with specific objections to the appointment order and no filing requesting that the court amend the order. Even in Husband's motion to strike, filed on November 14, 2019, the day after Dr. Alexander testified at trial, it is unclear what Husband's objection to Dr. Alexander's initial appointment would have been. We therefore determine that Husband has waived any issue concerning the appointment of Dr. Alexander. *See* Tenn. R. App. P. 36(a), cmt. a. ("[A] party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error.").[12]

As to Dr. Alexander's testimony during trial, Husband primarily asserts that the trial court abused its discretion by allowing Dr. Alexander to act as both the court's and Wife's expert witness and by allowing Dr. Alexander to testify beyond the scope of his written report. Wife argues that Husband also waived this portion of the issue by failing to timely object to Dr. Alexander's testimony. Wife further asserts that Husband "invited the error—essentially evaluating it to determine its effect before eventually deciding to move to strike it from the record."

Concerning evidentiary objections, this Court has explained in pertinent part:

Objections to the introduction of evidence must be timely and specific. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). An evidentiary objection will be considered timely either if it is made in a motion in limine or if it is made at the time the objectionable evidence is about to be introduced. *See Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990).

\* \* \*

---

[12] In his motion to strike the testimonies of Dr. Alexander and Dr. Hankins, Husband also alleged, pursuant to Tennessee Rule of Evidence 702, that neither expert had been properly vetted as a qualified expert. The trial court in its order denying the motion to strike found this argument unavailing. Husband has not raised an issue concerning either expert's qualifications on appeal.

Failure to object [to] evidence in a timely and specific fashion precludes taking issue on appeal with the admission of the evidence. *See Ehrlich v. Weber*, 114 Tenn. 711, 717-18, 88 S.W. 188, 189 (1905); *Pyle v. Morrison*, 716 S.W.2d 930, 936 (Tenn. Ct. App. 1986); Tenn. R. Evid. 103(a)(1).

*Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000).

In its August 2019 appointment order, the trial court directed the following regarding communication between Dr. Alexander and the parties:

The Court, notwithstanding Roach v. Dixie Gas, 371 S.W.3d 127, 146-47 (Tenn. App. [Ct.] 2011), directs that the parties' counsel and *guardian ad litem* may not have *ex parte* communications with the Court's Rule 35 expert witness until publication of the expert's report, other than to share this Order with that expert, arrange scheduling/appointments, payments, a deposition or court appearance, and tender to that expert documents and things addressed herein.[13]   The Court's expert shall be available for an interview, depositions for proof, or discovery, if requested by either party and the *guardian ad litem*, after publication of the expert's report, at the expense of the requesting party.  Prior to publishing a report, the Court's expert may contact the *guardian ad litem*, or counsel for the parties, with questions, to arrange appointments and/or payments of the expert's costs;

Costs of the Rule 35 examination shall be the equal responsibility of the parties, who shall pay their respective halves upon being billed by the Court's expert.  The Court shall entertain a Motion to reconsider the costs of the Rule 35 mental health expert upon request of any party after publication of the Court's expert's report[.]

(Paragraph numbering omitted.)

Dr. Alexander submitted his report on November 1, 2019.  In answer to the trial court's questions concerning competency, Dr. Alexander concluded in the report:  "It is

---

[13] In *Roach v. Dixie Gas Co.*, 371 S.W.3d 127, 147 (Tenn. Ct. App. 2011), this Court, having determined that the requirements had been met for granting a motion filed by the defendant to have the plaintiffs examined by a physician, concluded that "once the requirements of Rule 35 have been met, a trial court has the discretion to compel a plaintiff to submit to a medical examination by a medical expert chosen by the defendant, and that the defendant and/or his counsel may have *ex parte* communication with that expert in preparation for the medical examination and for trial."

my opinion, within a reasonable degree of medical certainty that [Husband] has the capacity to adequately, sufficiently and appropriately testify during his divorce and custody court hearing, and does not need a conservator or *guardian ad litem* to assist him in testimony preparation or testifying." In relevant part, Dr. Alexander further concluded in his report:

> [Husband] has a history of over endorsing psychiatric symptoms on psychological testing, which may be consistent with a tendency to exaggerate, which could be for attention or as part of his tendency to over self-evaluate and over think questions. There is no doubt he has a serious mental illness, Schizoaffective Disorder or Schizophrenia, which has produced a plethora of serious symptoms in him, regardless. Either of these diagnoses could cause him to over-interpret or misunderstand the intent of the questions on this test. There doesn't appear to be a logical reason why he would want to look worse than he is, since he definitely wants to testify and be heard, and I doubt he would want to sabotage his chances of doing so by exaggerating to look more cognitively impaired.

On November 4, 2019, Wife's counsel sent an email message addressed to Husband's counsel, the GAL, and Wife. In this message, which is in the appellate record as an attachment to the trial court's order denying Husband's motion to strike, Wife's counsel stated in relevant part:

> I've asked Dr. Alexander to testify in person about the Court's questions and about follow up questions I had about [Husband's] mental abilities. I want Dr. Alexander elaborating why [Husband] is competent, and needs neither a GAL nor conservator. Rather than just ask questions of Dr. Alexander at trial, I've told Dr. Alexander what I'd like to introduce at trial, so he can prepare more than to just answer the court's three questions.

> Because the three questions asked by the court required Dr. Alexander consider certain documents and things required shared with him, but my questions require Dr. Alexander to review them with another perspective, and review more documents, I'm asking more work of Dr. Alexander than the court asked. For example, Dr. Alexander told me he'd like [Husband's] testimony on direct examination. I successfully argued in chambers July 22, 2019, (when the court decided to appoint its own expert) that [Husband's] testimony ought not be given to the court's expert, because I'd not been able to cross examine, yet. Because Dr. Alexander said he'd like it, [Wife] is emailing it to Dr. Alexander today.

I want to develop Dr. Alexander's conclusions, and bases for the conclusions. I also want to have Dr. Alexander help the court understand/distinguish his testing and Dr. Grello's, and comment upon records the chancellor did not require shared with Dr. Alexander before he published his report.

I want Dr. Alexander addressing [Husband's] malingering scores, self reported symptoms, healthcare providers' records, and the effects upon a determination of whether [Husband] can mentally function well enough to work.

Dr. Alexander's report is desired introduced via Dr. Alexander's testimony in court, as is his testimony about [Husband's] malingering and alleged mental issues claimed to be impairing [Husband's] ability to work. Dr. Alexander will testify about the records [Husband's counsel] gave to him; about the conclusions and bases documents of his report; about the Grello deposition, especially my cross examination; and address, from a psychiatric perspective, [Husband's] employability and the Hankins report.

Dr. Alexander's testimony will address and expound upon his report, and also explain his opinions about [Husband's] malingering to get money.

I've talked to and cleared with Attorney Russ Willis, of the Tennessee Board of Professional Responsibility, [Wife] hiring the court's expert to answer more than the court's three questions. Mr. Willis may be reached at . . . . The Board's opinion is that there's nothing unethical about my hiring Dr. Alexander to testify beyond the court's three questions. With so much unethical conduct alleged incident to this case, I wanted to bring this opinion to the forefront.

[Wife] is hiring and will pay for what I've asked Dr. Alexander to testify about exceeding the court's mandate regarding competence, a GAL and/or conservator. She'll visit him November 7 to answer Dr. Alexander's questions regarding what [Husband] told Dr. Alexander. That will be sought reimbursed as a litigation expense.

As all know, I've asked Dr. Hankins to share his report and bases documents with Dr. Alexander. I expect that to happen before long today, if not done already. If any want other records or things considered by Dr. Alexander, I invite records or things to be submitted to him, with copies to counsel of record.

I'm told each party still owes $1,500 for Dr. Alexander's work preparing to answer the court's three questions, and doing so in his report. As stated, [Wife] will contract to pay Dr. Alexander for the follow up work he'll testify about. The court will be asked to address expenses, costs, and fees November 14, 2019.

I plan to cross examine [Husband] all day long November 12, 2019, or for as long as allowed. I plan to introduce Dr. Alexander's testimony at 9 a.m. November 13, 2019, and Dr. Hankins's testimony that day at 1 p.m. I plan to make closing arguments November 14, 2019, and ask for expenses, costs, and fees then.

Dr. Alexander testified at trial that he is a licensed psychiatrist, that he had previously served as the medical director at Lakeshore Mental Health Institute for twelve years, and that he now operates a forensic and consultative practice based at Fort Sanders Regional Medical Center. Dr. Alexander's trial testimony began with examination by Wife's counsel, initially eliciting information regarding Dr. Alexander's educational background and professional qualifications as a forensic psychiatrist. The following exchange then ensued:

| Wife's Counsel: | Has your background, your education and your experience come into play forming your conclusions that [Husband] has no schizophrenia and no schizoaffective disorder and he's competent? |
|---|---|
| Dr. Alexander: | Yes. And competency, I just want to be clear, that it depends on what the question is and – |
| Wife's Counsel: | Sure. There are degrees of competency, aren't there? And – |
| Dr. Alexander: | Well – |
| Wife's Counsel: | – there are competencies to be – |
| Husband's Counsel: | Your Honor, I object to leading at this point. |
| Wife's Counsel: | I'm supposed to lead. He's not my witness. |

| Trial Court: | Okay. Actually, he's the Court's witness, correct? This is the doctor that – |
|---|---|
| Wife's Counsel: | The Court appointed. |
| Trial Court: | —has evaluated him for competence purposes? Okay. I'm going to allow you to lead the witness, especially through this. |

Dr. Alexander testified that prior to issuing his report, he initially met with Husband on October 25, 2019, when he interviewed Husband and administered two tests: the SIMS (Structured Inventory of Malingering Symptomology) and the CNSVS (Central Nervous System Vital Signs). After submitting his November 1, 2019 report, Dr. Alexander requested a second interview with Husband, which was conducted on November 11, 2019, two days prior to Dr. Alexander's testifying at trial. As part of the second session with Husband, Dr. Alexander again administered the CNSVS. Dr. Alexander then opined during trial that Husband was malingering, was exaggerating his symptoms, and was capable of maintaining employment in a position similar to the one he had held at ORNL.

When Wife's counsel began to question Dr. Alexander regarding Husband's employability, Husband's counsel objected, and the following exchange occurred:

| Husband's Counsel: | Your Honor, I'm going to object at this point because his [Dr. Alexander's] role in this is to testify as to competency, and that was the only issue. |
|---|---|
| Wife's Counsel: | If [Husband is] competent to go back to work at the lab, it's relevant testimony. |
| Trial Court: | I'm going to allow it very briefly because that wasn't the purpose why he was appointed by the Court. But I'm going to allow him to make that statement. We're not going to go very deep into that because that was not the purpose of his appointment. |
| Wife's Counsel: | Very briefly, Dr. Alexander. Do you opine that [Husband] is able to go to work at the lab? |

Dr. Alexander:               Yes.

The GAL cross-examined Dr. Alexander before Husband's counsel did. When the GAL asked whether it was correct that he had changed his position since writing his report, Dr. Alexander responded affirmatively. In response to the GAL's question regarding why his opinion had changed, Dr. Alexander stated:

As I continued to read records and ponder things. For example, the testing that both the psychologists did, the results indicated -- for example, Dr. Grello – that [Husband] had schizoaffective disorder. But that came about at the same time and using the same scales that were way over reported. So not only did he report in the ninety-eighth or ninety-ninth percentile of schizophrenic like symptoms, he was way up there several standard deviations above just the line that would make these symptoms significant, which would be sixty-five, such that the profiles might have been invalidated. Meaning that they couldn't trust many things about their results, but one of those would be the diagnosis. And when I first did my report, I didn't analyze these – the testing, the depositions. I don't think I had read the depositions of Dr. Young and Dr. Grello.

Subsequently, at the beginning of Husband's counsel's cross-examination of Dr. Alexander, counsel posed questions regarding the telephone conversation that she had engaged in with Dr. Alexander on November 8, 2019, and Dr. Alexander confirmed that his opinion expressed at that time had aligned with his report. Husband's counsel then moved that she "be allowed to take [Dr. Alexander's] cross examination on a later date," stating that Dr. Alexander was "completely contradicting" the conversation they had shared five days before and that she did not "understand why." Following argument from both parties' counsel, the trial court denied the motion, stating:

I'm going to order that the cross proceed at this time. He's clearly stated why he's changed his opinion since then, upon more thorough review of records provided. And at this point, I'm just not going to order another delay and we're going to proceed on.

The next day, Husband filed the motion to strike Dr. Alexander's and Dr. Hankins's testimonies.

As to Dr. Hankins, the vocational rehabilitation expert, Husband states in the argument section of his brief devoted to alimony that Dr. Hankins "changed his opinion when he spoke to Dr. Alexander one (1) day before trial" and "piggy backed off" Dr. Alexander. Husband does not raise an issue regarding Dr. Hankins's expert witness

testimony and does not develop an argument concerning the trial court's denial of his motion to strike Dr. Hankins's testimony. We therefore deem any issue as to Dr. Hankins's testimony to be waived. *See Hodge*, 382 S.W.3d at 334 ("Appellate review is generally limited to the issues that have been presented for review." (citing Tenn. R. App. P. 13(b))).

In asserting that Husband waived this issue as to Dr. Alexander's testimony, Wife states: "Husband did not take any action until <u>after</u> Dr. Alexander testified, when he moved to strike his testimony." We disagree. During Wife's counsel's questioning of Dr. Alexander, Husband's counsel first objected to leading and then to the scope of the questions, specifically to questions beyond the scope of Husband's competency to testify. When Husband's counsel subsequently requested that her cross-examination of Husband be continued to a later date, it is true that she did not specifically object to what she later termed a conflict of interest on Dr. Alexander's part or to the bases of Dr. Alexander's change in opinion. Arguably, if Husband's counsel had responded to the November 4, 2019 email message and checked with Dr. Alexander after her November 8 telephone call with him, Dr. Alexander's reconsidered opinion would not have been such a surprise.

However, upon careful review of the transcript, we find it reasonable that Husband's counsel would have thought that any objection along the lines of the arguments subsequently raised in the motion to strike would have been overruled as repeating the earlier objection to the scope of the testimony. We note also that the trial court in denying the motion to strike did not find that Husband's arguments in this vein had been waived through lack of a timely objection. Moreover, Husband's counsel filed the motion to strike on the morning after Dr. Alexander's testimony and while the trial was still in progress. We cannot conclude that Husband failed to act to correct a perceived error in the trial court's admission of Dr. Alexander's testimony. *See* Tenn. R. App. P. 36(a). We therefore determine that although Husband has waived any issue concerning the appointment of Dr. Alexander, he has not waived the portion of his issue concerning Dr. Alexander's testimony.

Turning to the merits of this issue, Husband primarily argues that the trial court should have granted his motion to strike Dr. Alexander's testimony based on a conflict of interest and lack of testimony as to the documents utilized to form Dr. Alexander's opinion. In its December 2019 order denying Husband's motion to strike Dr. Alexander's testimony, the trial court made the following findings of fact in relevant part:

> [Husband's] Motion [to strike] asserted Dr. Alexander's testimony exceeded the Court's appointment. It alleged Psychiatrist Alexander did so by testifying why [Husband] is competent, does not need a *guardian ad litem* nor a conservator, and elaborating during his testimony upon his

- 46 -

psychiatric opinions that [Husband] is not schizophrenic and does not have schizoaffective disorder.

[Husband's] Motion to Strike . . . asserted that Dr. Alexander had a conflict, after accepting the appointment to be the Court's expert witness to answer those three questions, then agreeing to work for [Wife] by elaborating upon answers to those three questions to testify why competence is concluded, why no *guardian ad litem*, nor conservator, is required, and follow up questions regarding malingering, diagnoses, and employability. As argued by counsel for [Wife], the psychiatrist would not do more work without assurance of payment, so [Wife] agreed to pay for this work but would, as the November 4, 2019, email explains, ask the Court to address this payment as a reimbursable litigation expense. Counsel for [Husband] explained she did not read that November 4, 2019, email before the trial resumed November 12, 2019.

Counsel for [Husband] objected during trial, asserting that the psychiatrist's testimony exceeded the three questions asked via the Order that [was] entered August 20, 2019. The objection was overruled, because the Court wanted to hear the testimony.

In the November 4, 2019, email, Dr. Alexander's conclusions and bases for those conclusions, were indicated desired shared with the Court as subjects of further psychiatric inquiry. Dr. Alexander was sought to contrast his testing with Dr. Grello's, as indicated in the November 4, 2019, email, which advised, "I want Dr. Alexander addressing [Husband's] malingering scores, self reported symptoms, healthcare providers' records, and the effects upon a determination of whether [Husband] can mentally function well enough to work." The psychiatrist was, as the email recites, going to be asked at trial to address his report and expound upon it. Dr. Alexander's testimony addressed these matters and others as defined in that email, including Dr. Grello's testimony, the Hankins report, and [Husband's] employability. The November 4, 2019, email invited both the *guardian ad litem* and counsel for [Husband] to share with Dr. Alexander whatever was desired considered by him.

Finally, [Husband] complained that Dr. Alexander changed his opinions from when Dr. Alexander previously expressed them, all of which were prejudicing cross-examination of Dr. Alexander.

* * *

- 47 -

The Motion to Strike was . . . opposed regarding Dr. Alexander's testimony. The evaluation published November 1, 2019, by Dr. Alexander, concluded by indicating that it was subject to change upon receipt of information inspiring changes. The November 4, 2019, email from [Wife's] counsel to the *guardian ad litem* and counsel for [Husband], which both acknowledged receiving, is attached and incorporated as if set forth *verbatim* herein. It indicates [Wife's] counsel was calling Dr. Alexander to testify about this Court's questions and follow up questions about [Husband's] mental abilities, and elaborating why competency is found. That email recites Dr. Alexander was advised what was desired introduced at trial so the psychiatrist could prepare to testify about more than merely answering affirmatively or negatively each question from the Court.

The Order from the July 22, 2019, trial date which appointed Dr. Alexander was the subject of different proposed Orders before it [was] entered August 20, 2019. It appointed Dr. Alexander, required [Husband] to present to Dr. Alexander for evaluation, and prohibited the parties and *guardian ad litem* from *ex parte* communications with the psychiatrist, until after he published his report. Delay resulted from [Husband] not presenting to the Court's expert psychiatrist until October 25, 2019, when he met with the psychiatrist for three hours.

It provided Dr. Alexander was to be provided certain documents as recited in that Order to answer the Court's questions, unless the Court's expert psychiatrist requested more. More was requested and provided, and all were invited to tender more information to Dr. Alexander, if they desired.

Dr. Alexander was asked by counsel for [Wife] to do more than merely answer affirmatively or negatively each question from the Court. Additionally, he was asked to elaborate, i.e., explain why [Husband] was competent and to explain what testing was performed and what else was considered to rule out malingering. Dr. Alexander's November 1, 2019, report addresses competence to testify and participate in this litigation but does not address mental competence as may be affected by mental illness.

Dr. Alexander was asked by counsel for [Wife] to pursue [Husband's] competency (in terms of mental capacity) to a conclusion, explaining to the Court in greater detail [Husband's] competence to work from a psychiatric perspective. Initially, Dr. Alexander, concluded he saw

- 48 -

no reason [Husband] would want to appear incompetent, lest he sabotage his chance to obtain custody of his adolescent daughter. Dr. Alexander requested the entire file, so he could review all of the evidence, although a short time to do so existed. Dr. Alexander testified he obtained from [Wife], or her counsel, the transcript of [Husband's] previous testimony, and obtained a flash drive, from Dr. Hankins, with Dr. Hankins' entire file. Dr. Hankins included in his report, as supplemented, an itemization of what was in that file.

After a second administration of the Structured Inventory of Malingered Symptomatology, and considering the secondary gain in a litigation context that a demand for $2,200 monthly spousal support presents, reviewing voluminous documents, and interviewing [Wife], and concluding the pursuit of money inspired just such a sabotaging of his testing to appear mentally ill, Dr. Alexander testified [Husband] was an exaggerator, liar, and malingerer.[14]

Although the trial court denied Husband's motion to strike Dr. Alexander's testimony, the court did order that Husband would be "afforded an opportunity to prepare to cross examine Dr. Alexander at [Husband's] convenience by deposition, or live testimony December 6, 2019, when the Court [was set to] recommence this litigation." Upon careful review, we conclude that the trial court did not abuse its discretion by denying Husband's motion to strike Dr. Alexander's testimony or by affording weight to the testimony. We will address each of Husband's arguments in turn.

First, Husband asserts that Dr. Alexander had an impermissible conflict of interest because he was initially appointed by the trial court as a Rule 35 expert to determine Husband's competency and was subsequently retained by Wife to opine further on Husband's possible malingering and ability to maintain employment. As noted above, the trial court stated in its August 2019 order that Husband had "deferred to the Court's desire to continue the case, to obtain an expert opinion as to [Husband's] competency to participate in this litigation or malingering." (Emphasis added.) In appointing Dr. Alexander, the court directed that he was "tasked with determining (1) if [Husband] is competent; (2) if [Husband] is a person with a disability in need of a conservator; and (3) if [Husband] requires a *guardian ad litem* to proceed with this litigation[.]" During trial, Dr. Alexander testified that a necessary component of evaluating competency was to screen the individual for malingering.

---

[14] We note that although Dr. Alexander did acknowledge agreement with Wife's counsel's characterization of his conclusion as having found Husband to be "an exaggerator, a liar, a malingerer," Dr. Alexander also clarified that he preferred the term, "malingerer," to "liar," and he did not use the term, "liar," in his own statements.

In *Roach v. Dixie Gas Co.*, 371 S.W.3d 127, 146 (Tenn. Ct. App. 2011), this Court clarified that Rule 35 does not contain a requirement that an expert witness appointed under the rule remain "independent." As this Court elucidated:

> Rule 35 is broadly written, intended to govern the myriad situations in which a party's physical or mental state becomes an issue in litigation and the truth of the claims may be ascertained only by an examination of the party's body or mind. Rule 35 requires only that the examination be done by a "suitably licensed or certified examiner."

*Id.* (quoting Tenn. R. Civ. P. 35.01). In *Roach*, a personal injury case, the trial court, upon the defendants' motion, appointed a Rule 35 expert witness physician to examine the plaintiffs concerning their alleged injuries. 371 S.W.3d at 143.

Although we find *Roach* to be instructive in terms of the communication allowed between a Rule 35 expert and each party's counsel, we recognize that the situation in *Roach* was different from the situation in the instant action. In *Roach*, one of the issues raised on appeal was whether the trial court had erred in granting the defendants' motion to appoint a Rule 35 expert. *Id.* at 142. In contrast, here, the trial court had initially appointed an expert witness to conduct a forensic psychological evaluation of Husband prior to trial in a set of agreed orders, referring first to Dr. Koller in its June 2016 order as Wife's expert witness and then likewise to Dr. Young in its June 2017 order as Wife's expert witness. In its April 2019 "Amended Rule 35 Order," the court appointed Dr. Kronk to succeed Dr. Young; however, the court now termed this appointment "as the Court's expert to evaluate [Husband] regarding any mental conditions he may have that regard his ability to parent and alleged inability to work." Husband did not object to the appointment of Dr. Kronk, who ultimately declined the appointment.

As to Husband's psychological witness, the trial court clarified in its April 2019 order that Dr. Grello had been retained by Husband to act as his "evaluating psychological witness." *See Roach*, 371 S.W.3d at 146 (noting "the well-established proposition that, so long as the plaintiff had the right to select his own doctor to testify as to his physical or mental condition, fundamental fairness demands that the defendant have the same right"). Upon Wife's motion, the court limited Dr. Grello's deposition testimony to the scope of her report based on the court's finding that Husband had not provided Dr. Grello with all of his relevant records and had not informed her that he was seeking alimony. Husband did not call Dr. Grello as a witness at trial; however, Dr. Grello's May 2019 deposition was presented as an exhibit and was reviewed by the court prior to the court's appointment of Dr. Alexander. As described above, the court then *sua sponte* appointed Dr. Alexander in August 2019 as the court's Rule 35 expert. Husband

- 50 -

essentially argues that the court abused its discretion by allowing Wife to co-opt Dr. Alexander as her expert witness.

Noting that a trial court "may choose to appoint its own objective, non-adversarial medical expert," the *Roach* Court stated that "in any case in which the trial court appoints its own expert, the trial court <u>may</u> seek to 'preserve' the 'independence' of the court's expert." *Id.* (quoting *Ewing v. Ayres Corp.* 129 F.R.D. 137 (N.D. Miss. 1989)) (emphasis added). As this Court further explained:

> [L]itigation may necessitate a Rule 35 examiner under a number of circumstances, including the appointment of an independent examiner for the court. In such a situation . . the trial court may set the parameters for the parties' contacts with the examiner, at the court's discretion. Any such limitations, however, are not mandated by Rule 35.

*Id.* at 147 (additional internal citation omitted).

In its August 2019 appointment order, the trial court set forth parameters related to when and how counsel for each party would be allowed *ex parte* communication with Dr. Alexander. Other than providing documents enumerated by the trial court to Dr. Alexander, neither party's counsel was to engage in *ex parte* communication with him, unrelated to the appointment order or logistical matters, until he had submitted his report. The order further provided that following publication of the report, Dr. Alexander would be "available for an interview, depositions for proof, or discovery" upon the request of either party and at the expense of the requesting party. We determine that the trial court's appointment order complied with the requirements of Rule 35. *See id.*

Moreover, although we recognize the rapid sequence of events occurring between the November 1, 2019 publication of Dr. Alexander's report and his November 13, 2019 trial testimony, we further determine that each party's *ex parte* communication with Dr. Alexander following the report's publication was in compliance with the order. Each party's counsel respectively interviewed Dr. Alexander, who testified at trial that after submitting his report and speaking to Wife's counsel, he had requested additional documents from Wife's counsel and had based the modification of his opinion in part on those documents. Wife's counsel notified Husband's counsel and the GAL of his intent to question Dr. Alexander in greater depth regarding the possibility of Husband's malingering and employability and his intent to forward more documents requested by Dr. Alexander, as well as of Wife's willingness to pay the additional cost for Dr. Alexander to perform "more work" subject to a request for an award of litigation expenses. We conclude that the trial court did not abuse its discretion by declining to find that Dr. Alexander had an impermissible conflict of interest.

Second, Husband posits that the trial court should have ordered Dr. Alexander's testimony stricken because it was unclear which records Dr. Alexander relied upon in forming his opinion. Specifically, Husband asserts: "The testimony of Dr. Alexander is difficult to follow as he states he has reviewed some records, does not know how he obtained all the records, has some records he has not reviewed and 'thinks' he was provided social security records." We note that the documents provided to Dr. Alexander were voluminous, in his words, "a pile that was over a foot tall" reviewed prior to publishing his report and "three thousand pages" subsequently sent to him. Dr. Alexander described his rationale for concentrating on some information, what he termed the "clinical pieces," more than others, such as court filings. According to Dr. Alexander, prior to writing his report, he was under the "misimpression" that he was to avoid Dr. Grello's records, and he subsequently reviewed her records and deposition testimony prior to trial. He stated that although he had Dr. Fisher's deposition during his initial review, he subsequently received Dr. Merchant's, Dr. Hankins's, Dr. Henderson's, and LCSW Roach's records, as well as depositions from Dr. Hankins and Dr. Merchant.

The trial court found in its order denying Husband's motion to strike that after submitting his report, Dr. Alexander had "requested the entire file," and had "obtained from [Wife], or her counsel, the transcript of [Husband's] previous testimony" and "a flash drive . . . with Dr. Hankins' entire file." As the court noted, Dr. Hankins had included in his supplemented report "an itemization of what was in that file." Husband argues, for example, that Dr. Alexander should have realized, prior to writing his report, that Husband had requested spousal support in his counter-complaint, which was among the court filings initially sent to Dr. Alexander. Husband has a point as far as it goes. However, given the trial court's discretion in determining the reliability of expert witness testimony and the fact that the court heard Dr. Alexander's description of the bases for his opinion during trial, we do not discern any abuse of discretion in the trial court's decision not to strike Dr. Alexander's testimony based on his description of the records reviewed. *See Brown*, 181 S.W.3d at 275 ("[T]he trial court enjoys the same latitude in determining how to test the reliability of an expert as the trial court possesses in deciding whether the expert's relevant testimony is reliable.").

Finally, Husband asserts that the trial court abused its discretion in declining to strike Dr. Alexander's testimony because of the testimony's "contrar[iness]" to the trial court's scheduling order, "any rules of discovery," and other expert testimony in the case; an "erroneous" result; and "injustice" to Husband. The scheduling order to which Husband refers was entered by the trial court on January 24, 2019, pursuant to the court's Local Rule 119.05, and required that "[o]pposing expert witnesses" be "disclosed no later than (60) days prior to trial" and that expert witness depositions be completed no later than thirty days prior to trial. This order was clearly superseded by the trial court's order

appointing Dr. Alexander, which set forth a specific schedule for submission of Dr. Alexander's report, communication with counsel, and testimony. As to "any rules of discovery," Husband fails to specify the rules to which he is referring and thereby waives any argument based on discovery rules. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) ("The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue."). Husband's assertion regarding contrariness to the trial court's scheduling order and rules of discovery is unavailing.

Husband's contentions regarding "contrar[iness]" to other expert testimony, a purportedly "erroneous" result, and "injustice" to Husband are related. The experts who testified at trial were Dr. Alexander and Dr. Hankins, both of whom concluded, as pertinent to the issues on appeal, that Husband was capable of returning to employment comparable to the position he had formerly held at ORNL. The trial court's credibility assessment of these experts who testified at trial is entitled to great weight on appeal. *See Burden*, 250 S.W.3d at 905 ("Because the trial judge is in the best position to assess the credibility of the witnesses, such credibility determinations are entitled to great weight on appeal."). "However, with regard to expert opinion that appears in the record purely in the form of written documents, an appeals court 'may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge.'" *Id.* (quoting *Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997)).

Upon exhaustive review of the voluminous record before us, we determine that when Dr. Alexander's opinion diverged from the other psychiatric practitioners' opinions (and from his own initial opinion), the basis for his change was reasonably supported by his rationale and references to testing results that indicated malingering on Husband's part. For example, in its final decree, the trial court found in part that Husband's malingering "was not discovered until this divorce case because none of his treating physicians ever sought psychological testing for [Husband]; instead they simply relied on his own self-reporting of symptoms." Regarding the efficacy of self-reporting of symptoms in this context, Dr. Alexander testified:

> [S]elf reports, especially in the court of law, lack credibility and have to be – there has to be information that will validate that. Most psychiatrists and – in this case, Dr. Fisher, he did not do any objective testing. So he only could rely on the subjective information coming from [Husband] and his subjective interpretation of how he presented. And so without that objective verification, it makes Dr. Fisher's diagnosis [of schizo-affective disorder] tentative.

Husband particularly takes issue with the trial court's treatment of Dr. Grello's report and deposition testimony in comparison to Dr. Alexander's trial testimony. In weighing the two, the trial court in its final decree stated the following in pertinent part:

> Dr. Grello performed numerous tests on [Husband]. The Wechsler Adult Intelligence test (WAIS-IV) indicated [Husband] has an IQ [intelligence quotient] of 134, placing him in the very superior range. Dr. Grello also gave [Husband] the Rorschach Ink Blot test, but invalidated this test because she discovered that [Husband] had researched and reviewed materials on the test and that fifteen of his answers were directly out of the book "Big Book of Secrets" which [Husband] indicated he had purchased and read. Dr. Grello also administered the MMPI-2 [Minnesota Multiphasic Personality Inventory], for which [Husband's] F-score, the validating score, was again elevated as well as the F-back (F-B) validating score were high. Contrary to the other evaluating physicians, Dr. Grello denied that this indicated malingering. Yet these validating scores are designed to test for malingering or exaggerating. Again, this court notes that at no time was Dr. Grello ever informed that there was a secondary gain aspect to this case. Her evaluation was geared only towards custody issues. She never read the pleading in this case to see that alimony was being sought, nor did she ever review the deposition of [Husband]. Dr. Grello was also not provided with all of [Husband's] medical records. She was also not aware that Dr. Smith had previously administered the MMPI. For these reason[s] the court questions the conclusions drawn by Dr. Grello as she clearly did not have the full picture of the case in which she was hired to render an expert opinion. Dr. Grello also indicated that she did not realize that malingering was going to be such an issue in this case otherwise she may have given [Husband] the SIMS test which is the "gold standard" for determining malingering.

Our review of Dr. Grello's report and deposition testimony support the trial court's findings in this regard. Additionally, we note that the trial court did not base this comparison on any credibility determination as to Dr. Grello, which was proper given that the court did not hear Dr. Grello testify during trial. *See Burden*, 250 S.W.3d at 905.

Husband also takes issue with "the scrutiny [the trial court] placed" on Dr. Grello in comparison to Dr. Alexander. We find this argument unavailing as well because the orders entered by the trial court confining Dr. Grello's testimony to her report and reviewing communications with Dr. Grello were upon Wife's motions during the pre-trial discovery phase of the proceedings and upon specific findings regarding Dr. Grello's

initial refusal to provide certain documentation. Husband could have filed such a motion to limit Dr. Alexander's testimony prior to trial and did not.

We emphasize that "it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson*, 654 S.W.2d at 676-77. Contrary to Husband's argument, the trial court's denial of his motion to strike Dr. Alexander's testimony was not based on an erroneous assessment of the evidence or reasoning that caused an injustice to Husband. The trial court did not abuse its discretion in declining to strike Dr. Alexander's expert testimony or in affording it weight when considering Husband's employability.

## VII. Alimony *in Futuro*

Husband contends that the trial court erred by denying his request for "the alimony he sought at trial." Although Husband did not specify an amount or type of alimony in his counter-complaint and has not done so on appeal, he confirmed through his testimony at trial that he was seeking $2,200.00 monthly in alimony for "a life term," which indicates a request for alimony *in futuro*.[15] Husband specifically argues that "the weight of evidence established that Husband was unable to work, needed alimony and that Wife had the ability to pay." We disagree and conclude that the trial court did not abuse its discretion in denying Husband's request for alimony *in futuro*.

Tennessee law recognizes four types of spousal support: (1) alimony *in futuro*, also known as periodic alimony; (2) alimony *in solido*, also known as lump-sum alimony; (3) rehabilitative alimony; and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d) (2021); *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012). Our statutory scheme indicates a legislative preference favoring the short-term forms of spousal support, rehabilitative and transitional alimony, over the long-term types of support, alimony *in futuro* and alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Mayfield*, 395 S.W.3d at 115; *Riggs v. Riggs*, 250 S.W.3d 453, 456 (Tenn. Ct. App. 2007). Alimony *in futuro*, at issue in the case at bar, may be appropriate, however, when rehabilitation of the economically disadvantaged spouse is not feasible. *See* Tenn. Code Ann. § 36-5-121(d)(4). Tennessee Code Annotated § 36-5-121(f)(1) (2021) further provides:

> Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is

---

[15] The amount requested by Husband of $2,200.00 was approximately equal to the seventy-five percent of the parties' mortgage payment that Wife testified she had informally agreed to pay when the parties separated and during the pendency of the divorce only.

relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

It is well settled that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Mayfield*, 395 S.W.3d at 114; *see also Fickle v. Fickle*, 287 S.W.3d 723, 736 (Tenn. Ct. App. 2008).

Tennessee Code Annotated § 36-5-121(i) (2021) provides statutory factors to be considered as guidance when determining the nature and amount of an alimony award. In its final decree, the trial court set forth specific findings of fact applicable to each statutory factor as follows:

**(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources[.]**
The court has already made its finding regarding the relative earning capacity of each party being similar. [Husband's] last employment had his earning at $80,000+ per year. Both parties filed affidavits of income and expenses. The court has concluded that [Husband] has the ability to work earning in the range of $65,000-$80,000 per year, yet he has chosen not to do so. The court has further concluded that this is due to [Husband's] lack of motivation, and not due to incapacity due to any mental illness.

**(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level[.]**
Both parties in this case are highly educated. Neither party requires any additional education to secure employment.

**(3)** **The duration of the marriage[.]**

This is a twenty-two (22) yearlong marriage. The parties separated in 2015 and the divorce has been pending since 2015, so the parties resided together for 18 years.

**(4)** **The age and mental condition of each party[.]**

Both parties are of similar age and the court has already made its finding related to [Husband's] malingering and exaggerating his mental condition and the court's conclusion base[d] on the expert testimony that [Husband] is capable of returning to work and his failure to do so is related to his own motivation and not his mental condition[.]

**(5)** **The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease[.]**

Although [Husband] complains of numerous physical ailments, he suffers from no physical disability such that it would impact his ability to work. [Husband] chose to appear each day in court with a cane; however there is no medical proof before this court that indicates [Husband] has the need for such assistance and proof offered at trial shows that when outside of court [Husband] often walks without a cane.

**(6)** **The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage[.]**

Neither party needs to remain at home to be the custodian of the parties' minor child.

**(7)** **The separate assets of each party, both real and personal, tangible and intangible[.]**

The parties have very few separate assets except for the few items of personal property that the court previously determined were gifts or premarital item[s] belong[ing] to the wife that total $130.00 in value.

**(8)** **The provisions made with regard to the marital property, as defined in § 36-4-121[.]**

The court has equitably divided the marital assets set forth in this order with [Husband] receiving $432,511.70 in marital assets

after the marital debts were deducted. [Wife] received $453,794.02 in marital assets after the marital debts were deducted. This is a substantial amount of money available to both parties in order to meet their needs following this divorce.

**(9)    The standard of living of the parties established during the marriage[.]**

Although the parties' marital home was quite large, these parties did not establish an extravagant standard of living during their marriage.

**(10)    The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party[.]**

This factor is not applicable to this case, as neither party made substantial contribution to the marriage as homemaker or contributed to the education of the other party.

**(11)    The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so[.]**

This court has found that [Husband] is at fault in this divorce due to the domestic violence he committed against [Wife].

**(12)    Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.**

The court finds that [Wife] has carefully compiled her expenses and is taking into consideration her being solely responsible for providing for the minor child's activities such as girl scouts, as well as paying for the minor child's private school tuition, and continuing to contribute to the college fund for the minor child. She states that her monthly expenses are $13,824.44. Her monthly gross income is $11,504.74 and she also receives $893 in social security benefits for the minor child. The court has reviewed her affidavit and considered her affidavit of expenses carefully and finds it reasonable for her to maintain her household and provide for her daughter, noting here that she will not be receiving any child support from [Husband] until such time as he reenters the workforce.

[Husband] reports his monthly expenses as being $6,632.30; however, this court has reviewed his expenses and finds that some of his values are inflated for maintaining his standard of living for one person. His stated expenses also included $880.00 continued payments to the Assurance Group for supervised visitation, which this court did not order. The court finds that [Husband's] expenses run based on the statement of his expenses approximately $4,369.30. His current income is $4,187.00.

The court finds that based on the fault of the parties in this divorce case, the fact that this court has concluded that [Husband] has the ability to work and chooses not to do so, finding [him] voluntarily unemployed, as well as [Husband's] receiving some $432,511.70 in marital assets this court finds that [Husband] will not be awarded the requested alimony in this case.

Upon careful review, we determine that the evidence preponderates in favor of these factual findings.

Husband acknowledges that his argument concerning alimony is closely related to the previous issue concerning expert witness testimony. He posits that if the trial court had stricken Dr. Alexander's testimony, the record would contain no proof to support the court's finding that Husband was capable of maintaining employment.[16] Husband thereby argues that he has an ongoing need for alimony and that Wife has the ability to pay. We note that "[a]lthough each of [the statutory] factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457).

Having determined that the trial court did not abuse its discretion in denying Husband's motion to strike Dr. Alexander's testimony, we further determine that Husband's argument concerning the trial court's finding that he was voluntarily unemployed is unavailing. Furthermore, as Wife points out, the trial court also considered the parties' respective expenses in light of their current individual incomes, which in Husband's case was comprised of his current disability benefits.

---

[16] Husband acknowledges that Dr. Hankins also testified that Husband was capable of maintaining employment. Husband, however, implicates Dr. Hankins's testimony as having been swayed by a telephone conversation with Dr. Alexander on the day before both testified at trial. Husband has not developed a specific argument concerning the trial court's denial of his motion to strike Dr. Hankins's testimony, and as noted in the previous section of this Opinion, we therefore deem any issue as to Dr. Hankins's testimony to have been waived.

As to Wife's ability to pay alimony, Husband argues that her financial affidavit indicated "certain expenses, such as new car payment ($500), college fund ($1,000), 401K contribution ($1732), increase in medical expenses ($200) were excessively high or expenses Wife was not incurring during the divorce." However, the trial court made factual findings specific to Wife's financial affidavit, finding that it was "carefully compiled" and that Wife had "tak[en] into consideration her being solely responsible for providing for the minor child's activities such as girl scouts, as well as paying for the minor child's private school tuition, and continuing to contribute to the college fund for the minor child."

Additionally, one reason Husband is able to make his argument concerning a delineation between Wife's current and projected expenses is that Wife in her May 2019 financial affidavit clearly labeled a column for each and explained that her current monthly expenses were based on an average of her expenses for the preceding sixteen months with copies of "bank statements and recent bills" attached. In her projected expenses, Wife adjusted her housing expenses downward because she anticipated a less expensive mortgage and no longer paying rent to her mother. Furthermore, she dramatically reduced the amount she expected to pay for legal expenses as compared to her current legal expenses, yielding a total projected expense estimate that was actually $3,743.29 less monthly than the average she had documented for the previous sixteen months. When questioned regarding why she had projected that she would need to make payments on a new vehicle in the near future, Wife responded: "Because right now I'm driving a 2003 Honda Civic with almost close to a hundred and ninety, two hundred thousand miles, and so I anticipate needing a new car." The evidence does not preponderate against the trial court's finding that Wife had carefully compiled her affidavit and that the expenses represented there were reasonable.

In contrast, the trial court found that Husband's claimed expenses were "inflated for maintaining his standard of living for one person" and included $880.00 in monthly payments for supervised visitation that the court did not mandate in its final decree. Husband attached no documentation of his expenses to his financial affidavit. Considering the statutory factors and the broad discretion of the trial court, we conclude that the trial court did not abuse its discretion in denying Husband's request for spousal support.

## VIII. Decision-Making Authority

As his sole issue in regard to the PPP (permanent parenting plan order), Husband contends that the trial court abused its discretion by granting to Wife sole major decision-making authority over the Child. Husband postulates that the trial court failed to make

findings pursuant to Tennessee Code Annotated § 36-6-407(c) (2021) and failed to take into account Husband's past involvement in the Child's education and extracurricular activities. Wife asserts that in analyzing the statutory best interest factors provided in Tennessee Code Annotated § 36-6-106(a) (2021), the trial court made findings of fact sufficient to satisfy the statutory criteria for designation of one parent as sole major decision-maker and that the court did not abuse its discretion in finding that it was in the Child's best interest for Wife to be awarded sole decision-making authority. Upon thorough review of the record and applicable authorities, we agree with Wife on this issue.

Tennessee Code Annotated § 36-6-106(a) provides: "In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child." The trial court properly considered the statutory factors provided in § 36-6-106(a) in designating Wife as the primary residential parent of the Child and in fashioning the PPP governing the parties' residential co-parenting schedule and other co-parenting matters.[17]

---

[17] Tennessee Code Annotated § 36-6-106(a) provides the following best interest factors for courts to consider in making custody determinations:

(1)     The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2)     Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3)     Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4)     The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5)     The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6)     The love, affection, and emotional ties existing between each parent and the child;

(7)     The emotional needs and developmental level of the child;

As relevant to the issue at hand, Tennessee Code Annotated § 36-6-404(a)(5) (2021) provides that a permanent parenting plan shall "[a]llocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing" and that "[r]egardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child." "[I]n allocating decision-making authority," a trial court is required to consider the following criteria:

(1)    The existence of a limitation under § 36-6-406;

---

(8)    The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9)    The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10)    The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11)    Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12)    The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13)    The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14)    Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15)    Any other factors deemed relevant by the court.

Effective, March 18, 2022, the General Assembly has added a sixteenth factor: "Whether a parent has failed to pay court-ordered child support for a period of three (3) years or more." *See* 2022 Tenn. Pub. Acts, Ch. 671, § 1 (H.B. 1866).

(2)     The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court ordered parent education seminar;

(3)     Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education extracurricular activities, and religion; and

(4)     The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

Tenn. Code Ann. § 36-6-407(c). "'The child's best interests will be served if these decisions can be made without undue delay and stress.'" *Neveau v. Neveau*, No. E2015-02221-COA-R3-CV, 2017 WL 2459731, at *12 (Tenn. Ct. App. June 7, 2017) (quoting *Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *7 (Tenn. Ct. App. Dec. 12, 2008)).

As Husband asserts, the trial court did not specifically reference the Tennessee Code Annotated § 36-6-407(c) factors in its final decree. However, we determine that in conducting its best interest analysis according to the Tennessee Code Annotated § 36-6-106(a) factors, the trial court did make specific findings of fact related to the § 36-6-407(c) criteria for allocating decision-making authority. *See Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *6 (Tenn. Ct. App. Dec. 12, 2008) ("While the trial court is obligated to consider all the relevant factors in reaching its decision, it is not required to list in its opinions or orders each of those factors along with its conclusion as to how that factor affected the overall determination."); *see, e.g.*, *Holmes v. Holmes*, No. E2013-01301-COA-R3-CV, 2014 WL 408464, at *9 (Tenn. Ct. App. Feb. 3, 2014) ("Contrary to Mother's assertion, we find that the trial court did make findings of fact regarding the best interest of the Children in relation to the statutory factors listed above.").

As to the first § 36-6-407(c) factor, the trial court made factual findings relevant to two limitations under Tennessee Code Annotated § 36-6-406 (2014), which in the version applicable to this action provided in pertinent part:[18]

---

[18] Effective June 11, 2020, the General Assembly amended Tennessee Code Annotated § 36-6-406(a) to add that a limitation placed on a parent's residential time must also be found to be in the best interest of the child. *See* 2020 Tenn. Pub. Acts, Ch. 693, § 1 (S.B. 2733).

(a) The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:

* * *

(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

* * *

(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;

(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402; . . .

The trial court found that Husband had inflicted physical abuse on Wife during the marriage. In relevant part, "abuse" is defined in Tennessee Code Annotated § 36-3-601(1) (2021) as "inflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means, placing an adult or minor in fear of physical harm, physical restraint . . . ." Concerning factor (11) of Tennessee Code Annotated § 36-6-106(a), "[e]vidence of physical or emotional abuse to the child, to the other parent or to any other person," the trial court found the following:

[T]his Court has found that there was physical violence by [Husband] against [Wife] in this cause of action such that this factor weighs heavily in favor of [Wife] in this case. There has been no indication of physical abuse to the minor child however the Court notes that the abuse to [Wife] did occur in the presence of the minor child in the home, and the child made

disclosures regarding this abuse, reporting that she heard her father threaten to kill her mother[.]

The trial court found Husband to be at fault in the divorce due to physical abuse of Wife, a finding that Husband has not challenged on appeal.

The trial court also found that although Husband clearly loved the Child and had participated in supervised visitation successfully, he had difficulty consistently performing some parenting responsibilities. Tennessee Code Annotated § 36-6-402(2) (2021) defines "parenting responsibilities" generally as "those aspects of the parent-child relationship in which the parent makes decisions and performs duties necessary for the care and growth of the child." The statute then delineates specific areas of parenting responsibilities. *See* Tenn. Code Ann. § 36-6-402(2)(A)-(F). Regarding factor (2) under § 36-6-106(a), particularly each parent's "past and potential for future performance of parenting responsibilities," the trial court specifically found:

> In weighing this factor the Court finds that this weighs heavily in favor of [Wife]. As well given [Husband's] past inability to care for the minor child, the Court has serious concerns with his ability to perform future parenting responsibilities. He has shown himself incapable of maintaining his house in a condition that would make it a safe environment for the child to visit. He has shown the inability to correct the hoarding activity in his home. There appears to be no change in his current motivation or ability to operate on a normal schedule in such that he would be willing or available to provide such future performance of parenting responsibilities as consistently being able to pick up the child from school because he is sleeping.

The trial court also expressed concern regarding Husband's "mental and emotional fitness" and found that Husband lacked the "moral fitness to be the primary custodial parent" for reasons we need not describe in great detail here.

As to the second § 36-6-407(c) factor, "[t]he history of participation of each parent in decision making," Husband asserts that the trial court failed to take into consideration his role in the Child's life prior to the parties' separation. He notes his undisputed service on the board of directors of the Child's former school and his testimony regarding his support of fundraising events, provision of transportation to extracurricular events, "occasional[]" participation in the Child's medical appointments, role at home with the Child during summers prior to the parties' separation, and assistance with picking up the Child from school and helping her with her homework.

However, concerning related § 36-6-106(a) factors, we have noted above the trial court's findings regarding factor (2) related to Husband's performance of parenting responsibilities. In addition, the court found as to factor -106(a)(1), concerning each parent's relationship with the Child:

> [T]here is no question that [Wife] has performed the majority of the parenting responsibilities relating [to] the daily needs of the child. The Court heard extensive testimony regarding [Husband's] inability to care for the child specifically relating to not even being able to wake up in the afternoon consistently in order to go pick up the child from school. The Court also heard testimony regarding the father's mental state that draws into question whether or not he has ever performed parenting responsibilities for the minor child consistent with her needs. Testimony showed he changed exactly one diaper in the child's early years. That in addition to not being able to consistently . . . pick up the child from school although he was not working, there were also issues with him not consistently providing meals and getting homework done during his time alone with the child. For those reason[s] set forth above the court finds that this factor weighs heavily in favor of [Wife] in this cause of action.

The trial court also found that for similar reasons, § 36-6-106(a)(4), "[t]he disposition of each parent to provide the child with food, clothing, medical care, education, and other necessary care" "weigh[ed] heavily in favor" of Wife. Upon careful review of the record, we determine that the evidence preponderates in favor of the trial court's findings regarding these factors related to Husband's ability to perform parenting responsibilities.

The third factor provided under § 36-6-407(c) is "whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child." Husband is correct that the trial court made no specific findings as to this criterion. "When a trial court fails to make specific findings of fact with regard to the relevant statutory facto.rs, this Court must review the evidence in the record de novo to determine where the preponderance of the evidence lies." *Taylor v. Taylor*, No. E2013-01734-COA-R3-CV, 2014 WL 3763727, at *9 (Tenn. Ct. App. July 30, 2014).

As Wife notes, the parties' respective testimonies, particularly Husband's testimony, indicated that the parties had experienced an ongoing disagreement regarding the Child's religious upbringing. Additionally, the parties expressed differing views concerning whether Wife had taken Husband's scheduling preferences into account when arranging the Child's extracurricular activities.[19] Considering the violent nature of some

---

[19] In its final decree, the trial court directed that Wife would "select the day during the week" for Husband's visits "that has the least impact on the child's extracurricular activities" and that Husband

- 66 -

conflicts prior to the divorce and the acrimonious nature of the proceedings, we determine that the evidence preponderates in favor of the conclusion that the parents have not demonstrated an ability and desire to cooperate with one another in decision making regarding the child. *See* Tenn. Code Ann. § 36-6-407(c)(3).

We therefore conclude that three of the four § 36-6-407(c) criteria weigh against granting major decision-making authority over the Child to Husband and against assigning the parties as joint decision-makers. The trial court did not abuse its discretion in designating Wife as the sole decision-maker as to the Child's education, healthcare, extracurricular activities, and religious upbringing.

## IX. Attorney's Fees at Trial

In general, attorney's fees awarded incident to a divorce are considered an award of alimony *in solido*. *See Gonsewski*, 350 S.W.3d at 113 ("It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido." (citing Tenn. Code Ann. § 36-5-121(h)(1))). In this case, the trial court initially determined in its final decree that neither party would be awarded attorney's fees, stating:

> Although the wife has requested attorney fees in this case, the wife cannot demonstrate a need for alimony in solido under T.C.A § 36-5-121(h) such that an award for attorney fees would be appropriate in this cause of action. Likewise, looking at the totality of the circumstances, the amount of the marital estate that the husband was awarded in the equitable division, the husband cannot demonstrate a need for attorney fees as alimony in solido under T.C.A. § 36-5-121(h). Therefore, there will be no award for attorney fees in this cause of action.

However, upon Wife's post-judgment motion, the trial court granted to her an award of $65,000.00 in attorney's fees pursuant to Tennessee Code Annotated § 36-5-103(c). Noting in its August 2020 order that this statute had been "amended during the pendency of this matter in July 2018," the trial court found Wife to be the "prevailing party in the custody dispute which made up a large portion of the parties' divorce action." The court determined that $65,000.00 was "a reasonable portion of the total attorney fees to represent the portion dealing with the adjudication of custody."

On appeal, Wife argues as a threshold matter that Husband has waived this issue, pursuant to Tennessee Rule of Appellate 27(a)(7), because his sole citation to authority is

---

could either "request that his time be made up on a different day" or "be responsible for taking the child to her extracurricular events during his visitation" if the Child had an extracurricular activity that interfered with a visit.

to the statute upon which the trial court based the award of attorney's fees. We do not deem Husband's issue to have been waived. As to the merits of the issue, Husband asserts that the trial court erred in finding Wife to be the prevailing party because he succeeded in obtaining unsupervised visitation with the Child, and Wife counters that she was the prevailing party, particularly because Husband initially had requested that he be named the primary residential parent.

We determine, however, that the trial court committed what was in this case harmless error by applying the version of the statute that was not in effect when the divorce complaint was filed in April 2015. *See Nutt*, 980 S.W.2d at 368 ("Statutes are presumed to operate prospectively unless the legislature clearly indicates otherwise."); *see, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). The version of Tennessee Code Annotated § 36-5-103(c) (2014) applicable to this action provided:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

(Emphasis added.) Effective to actions filed on or subsequent to July 1, 2018, and therefore inapplicable to this action, the General Assembly amended § 36-5-103(c) to state:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

In the instant action, Wife was the plaintiff spouse and was the spouse to whom primary custody was awarded. *See* Tenn. Code Ann. § 36-5-103(c) (2014). Therefore, although the trial court awarded attorney's fees pursuant to Tennessee Code Annotated § 36-5-103(c) under the "prevailing party" standard that does not apply in this case, we determine that this was harmless error given that the court's findings of fact in this regard

also supported an award of attorney's fees under the applicable version of the statute. This Court has previously noted that in addition to the possibility of an award of attorney's fees as alimony *in solido*, "Tennessee Code Annotated section 36-5-103(c) provides another avenue for an award of attorney's fees" in divorce cases. *Sullivan v. Sullivan*, No. M2018-01776-COA-R3-CV, 2019 WL 4899760, at *17 (Tenn. Ct. App. Oct. 4, 2019); *see also Abernathy v. Abernathy*, No. M1999-00891-COA-R3-CV, 2000 WL 827949, at *8 (Tenn. Ct. App. June 27, 2000) (stating in a divorce case that "regardless of the propriety of an award of attorney's fees as alimony *in solido*, we conclude that the trial court was authorized by statute [referring to Tenn. Code Ann. § 36-5-103(c)] to order the Father to pay a portion of the Mother's attorney's fees").

In the case at bar, Husband's argument that the trial court erred in awarding attorney's fees at trial is entirely predicated on his assertion that he was the prevailing party. Although we do not find this argument persuasive in any case, we further find it unavailing under the applicable version of the statute because Wife was the plaintiff spouse who was awarded primary custody of the Child. *See* Tenn. Code Ann. § 36-5-103(c) (2014). Noting also the discretionary nature of the trial court's decision regarding attorney's fees, *see Hernandez*, 2013 WL 5436752, at *8, we conclude that Husband is not entitled to relief on this issue.

## X. Attorney's Fees on Appeal

Wife has raised an issue in her statement of issues in which she requests that this Court award to her attorney's fees on appeal. Husband has requested attorney's fees on appeal in the conclusion of his principal brief and reiterated the request in his reply brief while acknowledging that he did not raise the issue in his statement of issues. We determine Husband's request for attorney's fees on appeal to be waived. *See Hodge*, 382 S.W.3d at 334 (noting that because "[a]ppellate review is generally limited to the issues that have been presented for review," "the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should 'be oriented toward a statement of the issues presented in a case and the arguments in support thereof.'" (quoting Tenn. R. App. P. 27, advisory comm'n cmt.)); *see also Forbess*, 370 S.W.3d at 356 ("We may consider an issue waived where it is argued in the brief but not designated as an issue.").

In support of her request for attorney's fees on appeal, Wife relies on Tennessee Code Annotated § 36-5-103(c), the statute under which the trial court awarded attorney's fees at trial that the court found to be reasonably related to custody issues. "An award of appellate attorney's fees is a matter within this Court's sound discretion." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006). Exercising our discretion and particularly considering the portion of the marital estate distributed to Wife, the

attorney's fees awarded to Wife at trial, and her higher income at the time of the divorce, we decline to award attorney's fees to Wife on appeal.

## XI.  Discretionary Costs

Finally, Husband contends that the trial court abused its discretion in awarding a total of $55,637.05 in discretionary costs to Wife, asserting that "a majority of the costs were not allowed" under Tennessee Rule of Civil Procedure 54.04(2) and that Wife failed to file an affidavit supporting her motion for discretionary costs.  Wife contends that her motion was well supported by documentation of costs and that all were allowed under Rule 54.04(2).  Upon thorough review of the record and applicable authorities, we conclude that certain court reporter fees apparently attributable to pretrial hearings were not allowable under Rule 54.04(2).  We also conclude that other than a fee paid to Dr. Fisher specifically for deposition testimony and fees paid to Dr. Hankins specifically for report preparation and reservation of a trial appearance, we are unable to discern from the documentation presented by Wife what portions of each expert witness's fees requested were allowable under Rule 54.04(2).  We further determine, however, that the trial court did not abuse its discretion in awarding discretionary costs for other court reporter fees and an interpreter's fee.

> Tennessee Rule of Civil Procedure 54.04(2) provides in pertinent part:
>
> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion.  Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees; travel expenses are not allowable discretionary costs.  Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment.

This Court reviews an award of discretionary costs pursuant to an abuse of discretion standard.  *Carpenter v. Klepper*, 205 S.W.3d 474, 489 (Tenn. Ct. App. 2006).

> Concerning the assessment of discretionary costs, this Court has explained:
>
> Pursuant to rule 54.04, trial courts are vested with wide discretion in awarding discretionary costs, and this court will not interfere with such an award except upon an affirmative showing that the trial court abused its discretion.  Generally, trial courts award such costs to whichever party

ultimately prevails in the lawsuit, provided the prevailing party has filed a timely, properly supported motion. The successful party is not, however, automatically entitled to an award of costs. Instead, trial courts are free to apportion costs between the litigants as the equities of each case demand. Accordingly, if any equitable basis appears in the record which will support the trial court's apportionment of costs, this court must affirm. Moreover, on appeal, the appellant bears the burden of showing that the trial court abused its discretion in its assessment of costs.

*Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998) (internal citations omitted).

Following a hearing, the trial court determined in its August 2020 order that Wife was the "prevailing party" because the court had awarded the divorce to Wife based on its finding that Husband "was guilty of inappropriate marital conduct." Husband has not contested the trial court's finding that Wife was the prevailing party in the divorce, and the court's judgment supports this finding. Stating that the discretionary costs were "reasonable and necessary in this highly contested divorce action," the court awarded to Wife (1) interpreter fees totaling $656.90; (2) court reporter fees totaling $10,813.30; and (3) expert witness fees totaling $44,166.85. Although the court initially awarded to Wife the full amount of the GAL's fees, upon the GAL's motion to alter or amend, the court subsequently entered an order equally splitting the GAL's fees between the parties as they had initially agreed. On appeal, Husband does not contest the allocation of the GAL's fees.

Husband argues in part that Wife's request for discretionary costs should have been denied because Wife "failed to attach the necessary affidavit." In support of this argument, Husband relies on *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 36 (Tenn. Ct. App. 2002), in which this Court stated that "a party seeking [discretionary] costs must file a timely motion and must support this motion with an affidavit detailing these costs, verifying that they are accurate and that they have actually been charged, and that they are necessary and reasonable." However, the requirement of an affidavit was based on a prior version of Rule 54.04(2). As this Court has noted, "[t]he current version of the rule only requires that a motion be filed." *Burkey v. Post*, No. M2016-02411-COA-R3-CV, 2018 WL 3199552, at *5 n.7 (Tenn. Ct. App. June 28, 2017) ("Although the motion for discretionary costs still must be supported by proof, the requesting party is not limited to affidavits.").

Wife supported her March 2020 motion for discretionary costs with three collective exhibits: (1) a translating service's invoice related to Wife's mother's testimony at trial with a copy of Wife's check written to pay the invoice; (2) an itemized summary of court reporter costs, setting forth the date of each invoice and the date and

source of payment through Wife's counsel; and (3) summaries of expert witness invoices for Dr. Young, Dr. Fisher, Dr. Hankins, and Dr. Alexander, stating the date and source of payment through Wife's counsel. The motion was signed by Wife's trial counsel with a certificate of service to Husband's counsel and the GAL.

Husband posits that it was unreasonable for Husband to pay an interpreter for Wife's witness. Rule 54.04(2) provides for "reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42," which sets forth court appointment of interpreters. In this case, Wife's mother's primary language was not English, and although she testified partially in English, she also testified that she was more comfortable listening to questions and speaking through an interpreter. Wife and the Child resided with Wife's mother at the time of trial. Contrary to Husband's position on this issue, nothing in Rule 54.04(2) precludes the award of an interpreter's fee for the prevailing party's witness.

Noting that Rule 54.04(2) requires that discretionary awards for court reporter fees be confined to those "reasonable and necessary . . . for depositions or trials," Husband argues that Wife failed to specify whether the court reporter charges were related to depositions, trials, or other proceedings. Husband cites as an example the second entry on the exhibit, which states a court reporter fee for "May 2019" in the amount of $2,579.30. We observe, however, that May 2019 was the month in which the first three days of trial were held. Likewise, transcripts for four days invoiced in December 2019 followed closely in time after the November 2019 days of trial, and January 2020 invoices followed closely after the last day of trial in December 2019. Other fees were specified as corresponding to specific depositions.

However, three court reporter invoices were listed in Wife's exhibit as pertaining to services rendered prior to trial and do not indicate that they were for depositions. The dates and amounts of these invoices were December 31, 2018, for $100.00; April 2019 for $164.00; and May 10, 2019, for $75.00. Court reporter fees for attending pretrial hearings or preparing transcripts of pretrial hearings are generally not allowed by Rule 54.04(2). *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 216 (Tenn. Ct. App. 2008). We therefore determine that the award of these three invoices must be reversed, reducing the amount of discretionary costs awarded to Wife for court reporter fees by $339.00, from a total of $10,813.30 to a total of $10,474.30.

Concerning expert witness fees, Husband argues that fees paid to Dr. Young for other than his deposition should not have been allowed because he did not appear at trial and that fees paid to Dr. Alexander and Dr. Hankins were "not solely for deposition and/or trial." Rule 54.04(2) allows an award of discretionary costs for "reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials."

(Emphasis added.) Dr. Young was appointed as a Rule 35 expert to complete a psychological evaluation of Husband, which he submitted in a report and through deposition testimony. We therefore determine that fees directly related to his report preparation and deposition appearance would be allowable under Rule 54.04(2).

However, Wife's exhibit listed only a total fee paid to Dr. Young in the amount of $7,000.00, with a reference to Dr. Young's invoice attached to Wife's former counsel's January 2019 billing statement. This invoice, which is in the record, itemized ten fees on specific days for "Psychological Review of Records" and "Neuropsychological Testing [with] Interpretation & Report," totaling $7,300.00. Our Supreme Court has previously held that Rule 54.04(2) "specifically limits discretionary costs with regard to expert witnesses to their fees for testifying" and does not allow recovery under the rule for examination or evaluation of an individual. *See Miles v. Marshall C. Voss Health Care Ctr.*, 896 S.W.2d 773, 776 (Tenn. 1995); *see also Mass. Mut. Life Ins.*, 104 S.W.3d at 38 ("[P]revailing parties cannot recover expert witness fees for preparing for depositions or trial, no matter how reasonable and necessary these fees are."). We cannot discern from Dr. Young's invoice or Wife's exhibit the portion of Dr. Young's fees attributable to the actual preparation of his report or his deposition testimony.

Similarly, Dr. Hankins submitted a report as a vocational expert and testified at trial. The dates of his July 2019 invoices in the amount of $6,440.00 and $414.00 appear to correspond to the completion of his report, and the date of his November 2019 invoice in the amount of $2,449.85 appears to correspond to his trial testimony, both of which are allowed as discretionary costs under Rule 54.04(2). However, the invoices were simply listed in Wife's exhibit as attributable to Dr. Hankins with no specification as to whether any portion of the amounts may have been for services apart from the actual report and testimony, such as preparation for trial.

July 2019 invoices presented by Wife as exhibits during Dr. Hankins's testimony at trial itemized two expenses we find to be allowable under Rule 54.04(2): $1,610.00 specifically for report preparation and $460.00 as a "reservation fee" for his trial appearance. *See Duran*, 271 S.W.3d at 216 (holding that an expert witness's fee for reserving time in his schedule to testify at trial may be awarded as a discretionary cost under Rule 54.04(2)). Otherwise, Dr. Hankins's July 2019 invoices stated that his fees were for such services as record reviews and trial preparation. Dr. Hankins's invoice dated November 8, 2019, is only represented on Wife's motion exhibit, which does not specify what portion of the $2,449.85 invoiced on that date was for actual trial appearance. We therefore determine that all but $2,070.00 of the trial court's award of $7,000.00 in discretionary costs for Dr. Hankins's fees must be vacated.

As to Dr. Alexander, a November 19, 2019 invoice was listed on Wife's exhibit as pertaining to the psychological evaluation of Husband that Dr. Alexander was appointed to perform. Wife's one-half share of this evaluation's cost was $3,140.25. Although actual preparation of Dr. Alexander's report is allowable under Rule 54.04(2) as a "stipulated report," it is not clear from Wife's exhibit what portion of this fee was for examination of Husband rather than report preparation.

Additionally, Wife listed a November 19, 2019 invoice from Dr. Alexander in the amount of $13,948.83 "for additional work regarding malingering" and a December 12, 2019 invoice in the amount of $10,273.92 "for prepping for opposing counsel's cross via deposition and deposition." Our review of the record indicates that the fee for "additional work regarding malingering," was most likely attributable to additional record review, interviewing of Husband, and testing of Husband completed by Dr. Alexander after he had submitted his report. Because this work went beyond the stipulated report, it was not an expense eligible for a discretionary cost award unless some portion of the "work" was actual deposition or trial testimony, which was not specified in Wife's exhibit. Dr. Alexander's fee for deposition testimony was an allowed expense under Rule 54.04(2), but it is impossible to discern from Wife's exhibit the portion of the December 12, 2019 invoice that was charged for the actual deposition or whether any of the invoices listed for Dr. Alexander pertained to his trial testimony.

We emphasize that preparation for deposition or trial is not an allowed expense under Rule 54.04(2). *See Chaffin*, 211 S.W.3d at 294 ("We recognize that Rule 54.04(2) allows for recovery of 'reasonable and necessary expert witness fees for depositions . . . and for trials,' and that 'trial preparation services are not recoverable under the Rule." (quoting *Mass. Mut.*, 104 S.W.3d at 39)). In *Chaffin*, this Court vacated an award of expert fees when it could not be discerned from the record "what portion of the award for [the expert's] fee, if any, was attributable to trial preparation." 211 S.W.3d at 294. The *Chaffin* Court "remand[ed] the matter to the trial court to award expert fees for [the expert's] services only for items which are permissible under Rule 54.04(2)." *Id.*

In the case at bar, we conclude that the trial court's award of discretionary costs for expert witness fees pertaining to all but the fees noted above in the amount of $2,070.00 paid to Dr. Hankins and a $500.00 fee paid to Dr. Fisher, specifically labeled on Wife's exhibit as payment for a deposition appearance, must be vacated. We remand for the trial court to determine an award of discretionary costs solely for that portion of the remaining fees awarded as payments to Dr. Young, Dr. Hankins, and Dr. Alexander that are permissible under Rule 54.04(2). We affirm the trial court's award of discretionary costs for $2,070.00 in allowable expert fees for Dr. Hankins's services; the modified amount of court reporter fees in the amount of $10,474.30; and the full amount invoiced of $656.90 for the interpreter's fee, discerning no abuse of discretion in the trial

court's awards of these discretionary costs. We therefore affirm a total award of discretionary costs to Wife in the amount of $13,201.20.

## XII. Conclusion

For the foregoing reasons, we vacate the portion of the trial court's award of discretionary costs to Wife specifically as to the expert witness fees awarded for Dr. Young's services, for Dr. Alexander's services, and all but $2,070.00 for Dr. Hankins's services. We modify the award of discretionary costs for court reporter fees to reduce it from $10,813.30 to a total of $10,474.30. We affirm the remainder of the trial court's judgment, including discretionary costs awarded to Wife in the total amount of $13,201.20. We remand this matter to the trial court solely for a determination of the portions of Dr. Young's, Dr. Alexander's, and Dr. Hankins's respective expert fees, apart from Dr. Hankins's $2,070.00 fee that we have affirmed, which are allowable under Tennessee Rule of Civil Procedure 54.04(2). We further remand this case for enforcement of the judgment and collection of costs below. We deny Wife's request for attorney's fees on appeal. Costs on appeal are taxed to the appellant, James Gergel.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE